**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMCA-095**

**Filing Date:  July 21, 2009**

**Docket No. 28,266**

**JOSE SANDOVAL,**

    **Plaintiff-Appellee,**

**v.**

**BAKER HUGHES OILFIELD**
**OPERATIONS, INC.,**

    **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**Gary L. Clingman, District Judge**

Trenchard & Hoskins
Royce E. Hoskins
Roswell, NM

for Appellee

Montgomery & Andrews, P.A.
Sarah M. Singleton
Jaime R. Kennedy
Santa Fe, NM

Holland & Hart, LLP
Trent A. Howell
Larry J. Montaño
Santa Fe, NM

for Appellant

**OPINION**

**SUTIN, Judge.**

1

**{1}**     Defendant Baker Hughes Oilfield Operations, Inc. appeals following an unfavorable $2.2 million verdict in this negligence action. Defendant asserts error in denying its motion for a new trial or a remittitur, claiming that (1) insofar as the verdict was based on future damages, the verdict was not supported by substantial evidence, and (2) the evidence did not justify the amount of the award and was excessive because of Plaintiff's counsel's improper closing argument that tainted the verdict by "passion, prejudice, partiality, sympathy, undue influence, or a mistaken measure of damages." In this opinion, we reduce this string of descriptive nouns to "passion or prejudice." Defendant also claims that the court erred in awarding post-judgment interest at a rate of 15%.

**{2}**     We affirm the verdict and judgment. We hold that the court did not abuse its discretion or otherwise err in any regard. The evidence justified the amount awarded and was not grossly out of proportion to the evidence and substantial evidence supported the verdict. Defendant's passion or prejudice argument is unavailing because Defendant failed to preserve the underlying improper-closing-argument ground and the circumstances do not require us to overlook the preservation failure.

## BACKGROUND

**{3}**     Plaintiff Jose Sandoval worked for Key Energy and was injured in mid-December 2005 while assisting an employee of Defendant in setting a packer tool in an oil well owned by Latigo Petroleum. The tool was owned and operated by Defendant. Defendant and its employee, Johnny Taylor, were on site supervising operations related to setting the packer tool. Precision Wireline (Precision) was the operator that ran a wire, which was connected to the tool, from its truck. Precision experienced engine trouble that caused the process of powering and running the tool into and out of the well to be delayed several hours.

**{4}**     After the packer tool was finally set and brought to the surface, Mr. Taylor attempted to release the pressure from the tool, but he experienced a problem with the tool's primary bleed-off port and unsuccessfully tried various customary ways to accomplish the release. Mr. Taylor and others then attempted to unscrew the tool, at which time the tool blew apart, and the handle of the chain tongs that were attached to the tool struck Plaintiff and fractured his right femur.

**{5}**     Plaintiff sued only Defendant and only in negligence, claiming that Defendant failed to provide a safe place to work and safe equipment, failed to keep a proper lookout, failed to adequately supervise the work being performed in a safe manner, and directed work to be performed in an unsafe manner. The jury found Defendant to be 100% at fault and awarded Plaintiff damages in the sum of $2.2 million.

**{6}**     Defendant filed a motion for a new trial or, alternatively, for remittitur, asserting that the verdict was grossly out of proportion to the injury and shocked the conscience. One ground was that the award of damages "for future loss of earnings and/or pain and suffering" was not supported by the evidence. Another was that Plaintiff's counsel's closing argument inflamed the jury's passion or prejudice which led to an exorbitant and improper verdict. The district court denied Defendant's motion.

2

**{7}** Defendant appealed from the court's final judgment that awarded Plaintiff $2.2 million plus pre-judgment and post-judgment interest. Defendant also appealed from the court's order and amended order that denied Defendant's motion for a new trial or, alternatively, for remittitur.

**{8}** In its brief in chief, Defendant contends in its first point that the evidence is not sufficient to support the amount awarded. Defendant points to undisputed evidence that Plaintiff's special damages relate to his medical bills and lost wages totaling approximately $100,000; that Plaintiff's leg is fully healed; that Plaintiff is capable of returning to his old job; that Plaintiff did not sustain permanent muscle damage or bone deformation to his leg; and that Plaintiff's future pain and suffering would be limited to a dull ache during wet or cold weather, treatable with little or no medication. Thus, Defendant contends, neither the high-end estimate of $600,000 for loss of future earnings nor the approximate $1.5 million remaining for pain and suffering is supported by substantial evidence, and the district court therefore erred in not granting Defendant's motion for a new trial or remittitur. Defendant actually asserts that there is *no* evidence presented to support permanent pain except for a residual dull ache in the leg during cold or wet weather, and there is *no* evidence presented to support loss of future earnings. Defendant also argues that Plaintiff failed to prove loss of future earnings with reasonable certainty, arguing that whether Plaintiff would have been promoted to a higher position is speculative.

**{9}** Defendant contends in its second point that the verdict amount is excessive and shocks the conscience. Defendant essentially argues that the jury's factually unsupported, excessive award was reached based on Plaintiff's counsel's improper closing argument and on passion or prejudice, and thus the jury's deliberations and verdict were tainted by passion or prejudice.

**{10}** In oral argument, Defendant re-structured the foregoing two points. Defendant maintained that, under its first point, the amount of the verdict shocked the conscience and that in measuring what shocks the conscience, this Court examines other instructive cases in which courts have determined whether an award was excessive. Defendant argued that its substantial evidence contention in the first point was to be decided primarily, if not solely, on the basis of whether the verdict shocked this Court's conscience. Defendant maintained that its second point, which was that Plaintiff's counsel's closing argument remarks were improper and caused the jury's verdict to be tainted, was completely independent of its first point, and thus not affected were we to determine that the amount of the verdict was supported by substantial evidence. We address Defendant's arguments as they are presented in its briefs. However, we assimilate Defendant's various arguments into what we believe constitutes its essential contentions. We believe we cover all of Defendant's arguments. No tack Defendant has taken persuades us that the district court erred or that the verdict should be overturned.

**{11}** Defendant contends in its third and final point that the district court erred in awarding a 15% instead of an 8.75% post-judgment interest rate. We are unpersuaded.

**DISCUSSION**

3

## I.       The Excessive-Verdict Issues

## A.       Standards of Review

### Substantial Evidence

**{12}** The generally applicable substantial evidence standard is that we review the sufficiency of the evidence to support the verdict by examining whether the verdict is supported by "such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Weststar Mortgage Corp. v. Jackson*, 2003-NMSC-002, ¶ 8, 133 N.M. 114, 61 P.3d 823 (filed 2002) (internal quotation marks and citation omitted). We "review all evidence in the light most favorable to the verdict and resolve all conflicts in the light most favorable to the prevailing party." *Id.* Defendant assigns this standard of review to its first point on appeal.

### Abuse of Discretion

**{13}** The applicable standard in reviewing the denial of a motion for a new trial or remittitur is abuse of discretion. *See State v. Mann*, 2002-NMSC-001, ¶ 17, 131 N.M. 459, 39 P.3d 124 ("This Court will not overturn a trial court's denial of a motion for a new trial unless the trial court abused its discretion."); *Kestenbaum v. Pennzoil Co.*, 108 N.M. 20, 29, 766 P.2d 280, 289 (1988) ("Refusal to grant a new trial will only be reversed where it is found to be an abuse of discretion."). Defendant assigns this standard of review to its second point on appeal.

**{14}** "An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims v. Sims*, 1996-NMSC-078, ¶ 65, 122 N.M. 618, 930 P.2d 153. "When there exist reasons both supporting and detracting from a trial court decision, there is no abuse of discretion." *State v. Moreland*, 2008-NMSC-031, ¶ 9, ___ N.M. ___, ___ P.3d ___ (internal quotation marks and citation omitted). We "do not find an abuse of discretion unless the court's ruling exceeds the bounds of all reason or is arbitrary, fanciful or unreasonable." *Mayeux v. Winder*, 2006-NMCA-028, ¶ 34, 139 N.M. 235, 131 P.3d 85 (filed 2005) (internal quotation marks and citation omitted). Furthermore, this Court will determine that a district court has abused its discretion "when it applies an incorrect standard, incorrect substantive law, or its discretionary decision is premised on a misapprehension of the law." *Klinksiek v. Klinksiek*, 2005-NMCA-008, ¶ 4, 136 N.M. 693, 104 P.3d 559 (filed 2004) (internal quotation marks and citation omitted). In addition, we have ruled that "[w]here the court's discretion is fact-based, we must look at the facts relied on by the trial court as a basis for the exercise of its discretion, to determine if these facts are supported by substantial evidence." *Apodaca v. AAA Gas Co.*, 2003-NMCA-085, ¶ 60, 134 N.M. 77, 73 P.3d 215 (internal quotation marks and citation omitted).

**{15}** It is reasonable to conclude that a damages award that is clearly out of proportion to an injury or that shocks the conscience or that is not supported by the evidence would be one against the logic and effect of the facts and circumstances before the court, or against the

4

reasonable, probable, and actual deductions to be drawn from the facts and circumstances of the case. *Cf. State v. Hargrove*, 81 N.M. 145, 147, 464 P.2d 564, 566 (Ct. App. 1970) (stating that "an abuse of discretion is an erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn from such facts and circumstances" (internal quotation marks and citation omitted)).

**B.      Guidelines for Considering the Excessive-Verdict Issue**

{16}     "The question of excessiveness is determined by (1) whether the evidence, viewed in the light most favorable to plaintiff, substantially supports the award and (2) whether there is an indication of passion, prejudice, partiality, sympathy, undue influence or a mistaken measure of damages on the part of the fact finder." *Chavez v. Atchison, Topeka & Santa Fe Ry.*, 77 N.M. 346, 351, 423 P.2d 34, 37 (1967).  We have stated that the award is excessive if either of these tests is met.  *Gonzales v. Gen. Motors Corp.*, 89 N.M. 474, 480, 553 P.2d 1281, 1287 (Ct. App. 1976).  In *Sandoval v. Chrysler Corp.*, 1998-NMCA-085, ¶ 9, 125 N.M. 292, 960 P.2d 834, we repeated the *Chavez* test when determining "whether an award is so excessive that it shocks the conscience."

{17}     We are given a further guideline by our Supreme Court:

> [T]he findings of the jury should not be disturbed as excessive, except in extreme cases, as where it results from passion, prejudice, partiality, sympathy, undue influence, or some corrupt cause or motive where palpable error is committed by the jury, or where the jury has mistaken the measure of damages.  However, the mere fact that a jury's award is possibly larger than the court would have given is not sufficient to disturb a verdict.

*Richardson v. Rutherford*, 109 N.M. 495, 503, 787 P.2d 414, 422 (1990) (alteration in original) (internal quotation marks and citation omitted).

{18}     "The amount of awards necessarily rests with the good sense and deliberate judgment of the tribunal assigned by law to ascertain what is just compensation, and[] in the final analysis, each case must be decided on its own facts and circumstances." *Sandoval*, 1998-NMCA-085, ¶ 13 (internal quotation marks and citation omitted).  We are skeptical about the usefulness of comparing awards for pain and suffering in other cases. *See Sweitzer v. Sanchez*, 80 N.M. 408, 409, 456 P.2d 882, 883 (Ct. App. 1969) (stating that it is improper to compare an award in one case with awards made in other cases and that what other juries have done in cases involving similar injuries "is of no consequence" (internal quotation marks and citation omitted)); *Martinez v. Teague*, 96 N.M. 446, 452, 631 P.2d 1314, 1320 (Ct. App. 1981) ("We are warned by *Sweitzer* . . . that the comparison of awards is improper because the question of prejudice must be determined from the evidence in the case."). *But see Nava v. City of Santa Fe*, 2004-NMSC-039, ¶ 20, 136 N.M. 647, 103 P.3d 571 (determining that the amount of an award for emotional distress was excessive and citing a case that did the same).

**{19}** On appellate review, we will not weigh the evidence; therefore, an appellant's argument that a verdict is excessive based on evidence that conflicts with evidence that supports the verdict will not aid the appellant. *See Chavez*, 77 N.M. at 351, 423 P.2d at 37-38. Only in extreme cases will an award of damages be found excessive. *Id.* at 351, 423 P.2d at 38; *Diversey Corp. v. Chem-Source Corp.*, 1998-NMCA-112, ¶ 35, 125 N.M. 748, 965 P.2d 332.

**{20}** "In the absence of an unmistakable indication of passion or prejudice, a reviewing court will not set aside a jury's award of damages unless the amount of the verdict in light of the evidence indicates the jury was influenced by prejudice, passion, or other improper considerations." *Baxter v. Gannaway*, 113 N.M. 45, 48, 822 P.2d 1128, 1131 (Ct. App. 1991). A jury's damages award will be upheld unless "it appears that the amount awarded is so grossly out of proportion to the injury received as to shock the conscience." *Lujan v. Reed*, 78 N.M. 556, 564, 434 P.2d 378, 386 (1967); *Martinez v. Ponderosa Prods., Inc.*, 108 N.M. 385, 386, 772 P.2d 1308, 1309 (Ct. App. 1988).

## C.     Our Approach to Review of the Excessive-Verdict Issue

**{21}** Defendant's contentions attacking the verdict as excessive ultimately boil down to a contention that the evidence does not justify the amount of the award. Stated differently, the contention is that the amount awarded is grossly out of proportion to the evidence of Plaintiff's pain and suffering and work limitations that prevent him from returning to his pre-injury employment position. Defendant seeks to verify the conclusion stated in the foregoing contention with three arguments: the award shocks the conscience; other, similar decisions confirm that the award is excessive; and the award is "so unrelated to the injury and actual damages prove[d] as to plainly manifest passion and prejudice" from Plaintiff's counsel's closing argument. *See Nava*, 2004-NMSC-039, ¶ 20.

**{22}** The proper approach is to examine Plaintiff's evidence related to damages and determine whether that evidence could justify the amount of the verdict, or determine whether the verdict amount was grossly out of proportion to the evidence of Plaintiff's pain and suffering and work limitations that prevented him from returning to his pre-injury employment position. Our case law appears to instruct us to determine whether the disproportionality shocks our conscience.[1] *See Lujan*, 78 N.M. at 564, 434 P.2d at 386; *Sandoval*, 1998-NMCA-085, ¶ 9; *Martinez*, 108 N.M. at 386, 772 P.2d at 1309. If we

---

[1] We cannot pass up mentioning one court's view on how to determine excessiveness, as stated in *Smith v. Botsford General Hospital*, 309 F. Supp. 2d 927, 933 (E.D. Mich. 2004), *aff'd in part, rev'd in part on other grounds by* 419 F.3d 513 (6th Cir. 2005). The court stated it was "not alone in its thinking as to the lack of clear standards in determining excessiveness," and the court quoted comments of a judge made in a sexual harassment case in which the jury awarded $21 million: "[I]s this [issue of whether a verdict is excessive] merely going to become one of those areas of law in which we know it when we see it[?]" *Id.* at 933 n.2. We assume the judge was borrowing Justice Stewart's approach to recognizing pornography: "I know it when I see it." *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

determine this issue against Defendant, we question the need to turn to the issue of passion or prejudice, because the essential element for Defendant's passion-or-prejudice argument, that of an excessive verdict, is necessarily missing. Nevertheless, our case law indicates that passion or prejudice might independently be a basis on which to determine that an award is excessive. *See Sandoval*, 1998-NMCA-085, ¶ 9; *Gonzales*, 89 N.M. at 480, 553 P.2d at 1287. And Defendant argues that independence on appeal.

**{23}** We first address Defendant's sufficiency of evidence and excessive-verdict/disproportionality points after setting out the evidence essential to resolution of those issues. We hold that there was sufficient evidence for the jury to consider future damages and to arrive at an award based on future damages. We further hold that because the evidence justified the amount of the award and the award was not grossly disproportionate to the evidence, the district court did not abuse its discretion in denying Defendant's motion. We then turn to Defendant's excessive-verdict/passion-or-prejudice point and determine that it cannot survive our holding that the evidence justified the award and the award was not grossly disproportionate to the evidence. We also determine that Defendant failed to preserve the underlying arguments on which it bases its passion-or-prejudice contention.

## II.  Defendant's Contentions Relating to Evidentiary Support for the Verdict

**{24}** Showing that Plaintiff's special damages of medical expenses and lost wages totaled no more than approximately $100,000, Defendant contends in its first point on appeal that the remaining $2.1million of the verdict was "purportedly intended to compensate Plaintiff for pain and suffering and loss of future earnings." Defendant asserts that the highest possible lost future earnings estimate was no more than $600,000, leaving an approximate $1.5 million award for Plaintiff's pain and suffering. Defendant argues that Plaintiff did not prove future damages "based upon evidence adduced at trial" or within the "reasonable certainty" that is required in New Mexico law. *See Sanchez v. Martinez*, 99 N.M. 66, 71-72, 653 P.2d 897, 902-03 (Ct. App. 1982) (stating that an award of damages "must be based upon the evidence adduced at trial").

**{25}** A party seeking to recover damages has the burden of proving the existence of injuries and resulting damage with reasonable certainty. *Rael v. F & S Co.*, 94 N.M. 507, 511, 612 P.2d 1318, 1322 (Ct. App. 1979) ("Damages based on surmise, conjecture or speculation cannot be sustained. Damages must be proved with reasonable certainty. There is no exception to the . . . rule for future damages. The ultimate fact which the plaintiff has the burden of proving is future damages reasonably certain to occur as a result of the original injury." (citations omitted)).

### A.  The Evidence

**Surgery and Hospitalization**

**{26}** Plaintiff suffered severe pain following the injury and was given pain medication. The injury was a comminuted fracture of the right femoral shaft with foreshortened muscle tissue. The surgeon, Dr. Harmston, had to cut open the leg to reduce and set the fracture; he

described the fracture as unlike anything he had seen in complexity and difficulty in twenty years of treating similar injuries. In his deposition testimony, the surgeon described the surgery in part as follows:

> It was at the point of struggling because of his large size, he's a large man to begin with in terms of his thigh and his muscle, and this complicated by the amount of swelling and foreshortening caused by the fracture . . . that I actually, after numerous attempts to reduce the fracture with this small reaming rod or guide rod, . . . actually physically reduced his fracture, and that was not an easy task by itself. It was very difficult.

The broken femur required the placement of a metal rod and screws, and Plaintiff also had muscle and soft tissue damage, resulting in Plaintiff's complaints of pain and fatigue over time.

{27}     Following surgery, which was the day after the injury occurred, Plaintiff continued to experience pain while in the hospital. He was in the hospital approximately eight days. By March 2006 Plaintiff was released to clerical duty, one-half day work.

**Timothy Ryan, Physical Therapist**

{28}     Physical therapy was concluded in September 2006. A functional capacity evaluation (FCE) of Plaintiff, overseen by physical therapist Timothy Ryan, was performed on September 21, 2006. The FCE showed that, under the Department of Labor Physical Demand Classification, Plaintiff was physically capable of returning to "very heavy work," but Mr. Ryan's recommendation at the time was that Plaintiff only do "heavy work." This recommendation was made for the purposes of trying to prevent future injury. In his trial testimony, Mr. Ryan indicated that his recommendation was definite at the time of the FCE, but he also indicated that if Plaintiff "continued to exercise . . . and try and make further gains, there's a possibility that things could change." Under the "very heavy" description and consistent with what Mr. Ryan had seen in the field, Plaintiff would be required to lift 130 pounds from the ground; at the time of the FCE, he was able to lift 120 pounds and "he couldn't quite do the 130." Plaintiff was "quite strong," but "wasn't able to squat at all" and "was able to kneel for a couple of minutes, but with complaints of pain." "As pain increased, his heart rate increased." Further, Plaintiff was able to climb stairs "without a lot of problems" and was able to climb a ladder, but he had complaints of pain doing either activity. Thus, Plaintiff was able to function, but had difficulty "because of pain, and weakness and the situation, you know, the recovery of his leg." When questioned about Plaintiff's muscle weakness in his right lower extremity, Mr. Ryan stated that Plaintiff was graded "4 over 5" in the hip and quadriceps, which meant 80% when compared to Plaintiff's left side of "5 over 5," which is normal.

{29}     Mr. Ryan was asked whether the results of the FCE indicated whether Plaintiff could go back to work as a floorhand, derrickman, or operator. He responded that at the time of the test Plaintiff would have had marked difficulty doing that work because of the climbing and squatting, and Plaintiff was not at the level of what was required of everybody else. He

was asked by the jury whether, once Plaintiff had the screws removed in his second surgery, he could make a full recovery and be able to perform the same line of work, or would he continue to have a slight disability. He answered:

> It's rare with a screw removal or a pin removal for me to ever see those patients again. It's a pretty rare situation where they would come back for further rehabilitation. You know, if nothing else has changed from where he was when I did the [FCE] testing, I wouldn't have—unless I could actually quantify what he did in terms of lifting again, I don't know that he would make any further recovery than he already has.

Concerning Mr. Ryan's experience with the recovery of patients who had an intermedillary rod placed in their femur, he testified that Plaintiff would be in "the top five percentile of recovery of those people."

**Dr. Harmston, Surgeon**

{30}   In his August 2007 deposition, which was read at trial, Dr. Harmston was asked whether Plaintiff's fatigue and pain at the end of the day was caused by the rod and screws in his leg or whether that was "more . . . muscle and scar related." Dr. Harmston responded that it was most likely the soft tissue and muscle around the fracture that caused fatigue and limited his normal endurance. In regard to Plaintiff's discomfort with the rod and screws in his leg, Dr. Harmston stated that intramedillary rods "can be uncomfortable during the winter[,] . . . can . . . cause the bone sometimes to feel colder and make the limb feel colder[; symptoms that] sometimes . . . don't disappear until the metal is actually harvested from the limb." Dr. Harmston also said that "some of the discomfort that [Plaintiff] felt when he did deep repetitive squatting and kneeling might" result from "the presence of the rod and the screws up near the hip where the rod entered." That may have caused "scarring and irritation in the muscle of his thigh" caused by "the fracture . . . that would not be altered by the metal removal."

{31}   In regard to removing the screws and the continuing discomfort afterward, Dr. Harmston stated that "some of the discomfort that [Plaintiff] felt when he did deep repetitive squatting and kneeling might be secondary to the presence of the rod and the screws up near the hip where the rod entered." However, Dr. Harmston stated that "[s]ome of that limitation . . . is probably from scarring and irritation in the muscle of his thigh [which] . . . was initially injured from the fracture, and that would not be altered by the metal removal."

{32}   In addition to testifying that the fracture had healed, Dr. Harmston stated that the fracture was "very stable . . . for the most part" and that the surgery outcome was successful. Reading from a physical therapy evaluation which circled "excellent" in reference to Plaintiff's physical therapy rehabilitation potential, Dr. Harmston indicated that "excellent" was correct—he felt that Plaintiff's "rehab potential is excellent. Did then and probably still do now." As of the date of trial, Plaintiff had not chosen to have a second surgery.

**{33}**     Testifying from physical therapy notes, Dr. Harmston indicated that Plaintiff showed "difficulty in maintaining single leg stance" and also "show[ed] a slight antalgic gait during his single limb stance." Dr. Harmston testified that, beyond Plaintiff's lifting restrictions, having to engage in repetitive squatting, kneeling, and bending down, which stretch and aggravate muscle, kept Plaintiff from being able to return to work as a floorhand.

**{34}**     In reference to the FCE, Dr. Harmston stated that, given an eight-hour work day, Mr. Ryan was "saying that essentially [Plaintiff] can stand, walk, sit essentially normal amounts. These are normal amounts as far as I'm concerned a person would be able to do." That would be "[s]even hours is what he can stand," and he was "able to squat, crawl and climb, only occasionally." Further, Dr. Harmston stated that he did not disagree with the assessments by Mr. Ryan at all.

**{35}**     Concerning the FCE's recommendation, Dr. Harmston testified that he, "in no way, ever interpret[s] functional capacities as being finite, that it typically is an end-all to where a person's function will be forever." In Dr. Harmston's view, FCEs "are time dependent and typically are time dependent as a person recovers and more time passes between injury, intervention and the current time that we see continued progress." In that regard, Dr. Harmston also stated, "We see continued improvement in terms of strength and balance, and so forth, and that's just a matter of muscle slowly, even if not specifically exercise[d] through therapy, continues to get stronger and to recover in time, in a young person." Dr. Harmston thought that

> a person in good general health prior to an injury who has . . . an isolated injury has the ability in this day and age to recover nearly  fully . . . with very little restriction or problems that would persist that would be looked at as an impairment or problem which would negate [him] from being able to return to [his] normal activity level.

**Plaintiff**

**{36}**     At trial, approximately one year and ten months after the accident, Plaintiff testified about his life and condition. He postponed his wedding two years. He had difficulty engaging in activities he enjoyed with his fiancé, friends, and family, including dancing, horseback riding, and volleyball. In addition, his right leg fatigued easily, and he was no longer able to go hiking, hunting, fishing, or snowboarding with his friends and family. He was unable to enjoy his former active, outdoor lifestyle and had become a "couch potato."

**{37}**     Plaintiff testified that he worked as a floorhand, from "8 to 18" hours a day, depending apparently on the circumstances. In that job, he was required to stand the whole time and move around. He was required to squat, climb, and engage in "a lot of heavy lifting and moving." When asked if he had ever tried to go back to a floorhand position, Plaintiff indicated that he did not intend to look elsewhere for that position, stating "I'm not going to leave my job where I have benefits and stuff to go to an unsafe pulling unit where I can actually—if I get hurt I get kicked out for good[.]" In Plaintiff's view, based on the FCE results, he was not allowed by Key Energy to return to work as a floorhand. Based on how

10

he felt, Plaintiff did not believe he could perform the work required of a floorhand. Plaintiff testified at trial that he asked Key Energy if he could go back to work as a floorhand and that the company "ha[d] a strict policy that if you don't pass [the FCE], [they] can't put you out on a rig." Plaintiff conceded that the FCE showed that he was "very strong" and that lifting was not the problem, but stated that "[t]he problem is the moving around, the bending, the placement . . . you always have to crouch down or you're either kneeling to do something, picking something up, or sustaining something. That would be the hard part. The lifting, I'm a pretty strong guy, . . . I can lift stuff. It's just the fatigue." Plaintiff was taking over-the-counter pain medications such as Ibuprofen, Advil, and Tylenol on a daily basis.

{38}   But for the accident, Plaintiff was looking toward moving to the position of derrickman and then to the position of operator at Key Energy. He thought that he had a good shot at the operator position, given his ability to speak English, his knowledge of the job operations, and his experience. Operators at Key Energy were making $21.00 an hour. At the time of trial, Plaintiff was working in Key Energy's office, forty-hours per week, making $14.50 an hour with no overtime, receiving about $30,000 a year, whereas floorhands with his experience were making $16.50 an hour, had forty hours per week, and were regularly given a significant amount of overtime hours. His income declined from $50,000 to $60,000 annually to approximately $30,000 annually.

### Judith Beard, Occupational Therapist

{39}   Plaintiff relied on testimony of Judith Beard, Defendant's vocational rehabilitation counselor expert witness, who testified that Plaintiff's employment interests included being a tool pusher, a rig operator, a welding inspector, and a welder. She testified to hourly wages for workers in those positions and gave opinions as to Plaintiff's current and future employability. Her opinion was that Plaintiff had "a wide range of opportunities and he could take a job [from] some of these like rig operator." Ms. Beard understood that the usual progression in oil and gas work is from floorhand to derrickman to relief operator and then rig operator.

### Dr. Barry Diskant, Medical Expert

{40}   As part of its argument on appeal, Defendant discusses the deposition testimony of its medical expert, Dr. Barry Diskant, who examined Plaintiff just before trial, in mid-September 2007. Based on the examination, Dr. Diskant saw no permanent muscular injury, thought Plaintiff's femur was as strong as his other, uninjured femur, opined that Plaintiff was "presently able to do very heavy work, but probably not inclined to do so because of the pain," and further opined that "there was a zero percent impairment of [Plaintiff's] right lower extremity" because of the excellent reduction of the fracture. The doctor thought that Plaintiff would feel a dull ache in his leg when days were cold or wet, but that this could be handled with over-the-counter pain relief. Dr. Diskant testified that Plaintiff had no current impairment and that he was fully capable of returning to his old job.

{41}   We see no basis on which to consider facts and opinions presented by Dr. Diskant to support Defendant's lack of substantial evidence argument. The jury is free to reject an

expert's opinion. *Sanchez v. Molycorp, Inc.*, 103 N.M. 148, 153, 703 P.2d 925, 930 (Ct. App. 1985). Further, we consider evidence that supports the award, we do so in a light most favorable to the award, and we do not consider conflicting evidence or evidence that supports a contrary view, in determining whether there exists substantial evidence to support a verdict. *See State v. Kersey*, 120 N.M. 517, 520, 903 P.2d 828, 831 (1995) (stating that we do not consider the merit of evidence that may have supported a different result); *see also State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 (holding that contrary evidence does not warrant reversal because the jury is free to reject a party's version of events); *Chavez*, 77 N.M. at 351, 423 P.2d at 38 (stating that the appellate court does not weigh the evidence and recognizing that conflicting evidence is of no assistance to the appellant); *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177 ("The question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached.").

## B.      The Proceedings

**{42}**      Defendant moved for a directed verdict at the close of Plaintiff's case, arguing that Plaintiff had "not proved any future damages," and there was "no evidence before the jury that would allow them to find that there [are] future damages that [Plaintiff] will incur." Defendant argued that Mr. Ryan did not offer such an opinion and that Dr. Harmston was not going to offer such an opinion. Defendant argued that Plaintiff was physically qualified to do very heavy work with a recommendation that he do heavy work and that Mr. Ryan and Dr. Harmston had testified that the FCE was not static or set in stone. The district court denied the motion and stated that "[i]t becomes a jury question." Defendant does not indicate whether it repeated a directed verdict motion at the close of trial, before the jury was instructed and began deliberations.

**{43}**      The jury received instructions which permitted them to find that Plaintiff was entitled to damages arising in the future. The jury was also permitted to determine whether the damages arising in the future were "of a continuing nature" and, if so, "consider how long they will continue." The jury was further permitted when looking at loss of future earning ability to consider that some persons work all their lives and that a person's earnings may remain the same or may increase in the future. The jury was given a mortality table showing "the life expectancy of persons aged 26 . . . is 48.9 additional years." The sufficiency of the evidence is measured against the jury instructions, because they become the law of the case. *State v. Smith*, 104 N.M. 729, 730, 726 P.2d 883, 884 (Ct. App. 1986).

## C.      Defendant's Sufficiency of Evidence Argument and Our Holding

**{44}**      As we have indicated, Defendant argues that there was no evidence presented at trial that Plaintiff would suffer permanent pain, aside from a dull ache in his leg during cold or wet weather. Defendant also argues that there was no evidence at trial showing that Plaintiff's residual pain was permanent. Nor, Defendant argues, was there evidence that the limitations in Plaintiff's pre-injury work-related activities were of such permanency that they would prevent Plaintiff from returning to his pre-injury position. Further, Defendant argues, that there was no evidence that Plaintiff's recreational activities were permanently limited.

12

Defendant also argues that Plaintiff left the hospital in a week's time, started light duty work in three months, and was capable of performing heavy work by the end of a year's time. In addition, Defendant argues that future damages were not proved with reasonable certainty.

**{45}** We do not see in the record and Defendant does not point out in its briefs that Defendant objected to the future-earnings instructions on the ground that there was no evidence presented at trial to support a permanent injury or to entitle Plaintiff to instructions allowing a determination of damages based on life expectancy. Defendant had a duty to object to these instructions in order to preserve its apparent position that there was no evidence to support future damages, whether or not it raised the issue in a motion for a directed verdict. *See* Rule 1-051(I) NMRA (requiring, for preservation of error, an objection to be made to any instruction given); *Curtis v. Schwartzman Packing Co.*, 61 N.M. 305, 312, 299 P.2d 776, 781 (1956) (stating that the admissibility in evidence of life expectancy tables requires a showing of permanent injury). Defendant has waived any argument that there was no evidence to support a verdict awarding future damages and is now limited to an argument that the evidence was insufficient to support or to justify the amount of the verdict consisting of future damages. Even were there no waiver, we see no basis on which to conclude that there was insufficient evidence to allow the jury to consider future pain and suffering and economic damages.

## D. Defendant's Lack of Justification-Excessive Award Arguments and Our Holding

**{46}** Defendant acknowledges that "the valuation of pain and suffering is a difficult, inexact undertaking at best" and also that "there can be no standard fixed by law for measuring the value of . . . pain and suffering." *Sandoval*, 1998-NMCA-085, ¶ 13 (alteration in original) (internal quotation marks and citation omitted). It is not our duty on appeal to evaluate the value of pain and suffering. *Baxter*, 113 N.M. at 49, 822 P.2d at 1132. Defendant contends, however, that the jury is nevertheless bound by certain factors or "guideposts" it must consider, as indicated in 22 Am. Jur. 2d *Damages* § 221 (2008), which are the nature and extent of the injuries; the suffering occasioned by the injuries; the duration or prospective duration of the injuries; and the age, health, habits, and condition of the injured party before the injury as compared with the party's condition afterward.

**{47}** To support its argument as to the pain-and-suffering award, Defendant cites cases from other jurisdictions in which the injuries appear to have been worse than those of Plaintiff and in which the jury awards were considered excessive. *See Thompson v. Amerada Hess Corp.*, No. CIV.A.96-3265, 1998 WL 274260, at *1, 7-8 (E.D. La. May 26, 1998) (involving a fractured tibia shaft and knee joint, extensive surgeries with screws and metal plates, and then complications and permanent injuries, holding that $600,000 award for pain and suffering was excessive, and granting a new trial if the plaintiff declined a remittitur to $300,000); *Orellano v. 29 E. 37th St. Realty Corp.*, 772 N.Y.S.2d 659, 660 (App. Div. 2004) (holding awards of $2.5 million and $3 million for past and future pain and suffering, respectively, were excessive and that "for a comminuted fracture of the tibia and fibula that required several surgical procedures during a two-month hospital stay and extensive physical therapy thereafter, and resulted in partial permanent disability to a 47-

13

year-old man, the sum of $375,000 for each of [the] past and future pain and suffering is a more appropriate award"); *Williams v. Williams*, 641 N.Y.S.2d 408, 409 (App. Div. 1996) (involving a child's fractured femur where there was evidence of potentially permanent leg pain holding that $250,000 for pain and suffering was excessive, and granting a new trial if the plaintiff did not accept a remittitur to $100,000). Defendant also cites a case from another jurisdiction in which the injuries were worse than those received by Plaintiff and the jury award was lower than that given to Plaintiff and in which the court indicated that the jury award was appropriate. *See Policastro v. Savarese*, 567 N.Y.S.2d 784, 788 (App. Div. 1991) (involving a brain injury, a broken leg resulting in a limp, and a damaged eye muscle resulting in double vision and holding that $1 million for pain and suffering was appropriate). During oral argument before this Court, Defendant asserted that the appropriate, if not primary, way of measuring insufficiency of evidence is to look to these cases involving similar injuries.

{48} Defendant also acknowledges that damages for lost future earnings can be difficult to precisely measure. *See Smith v. FDC Corp.*, 109 N.M. 514, 520, 787 P.2d 433, 439 (1990) (determining, in an employment discrimination case, that "[a]lthough future earnings may be speculative and difficult to precisely measure, . . . there was sufficient evidence for the court to form a basis for its permissible speculation into [the plaintiff's] lost earnings"). But Defendant points out that, as with pain-and-suffering damages, an award for such damages cannot be based on surmise, conjecture, or speculation and must be proved with reasonable certainty. *See Sanchez*, 99 N.M. at 71-72, 653 P.2d at 902-03; *Rael*, 94 N.M. at 511, 612 P.2d at 1322. Moreover, Defendant asserts, the evidence must show that Plaintiff's injury was permanent or that the injury "would cause [a] disability in performing the usual duties of his employment in the future." *Garcia v. S. Pac. Co.*, 79 N.M. 269, 270, 442 P.2d 581, 582 (1968) (concluding that there was not sufficient evidence to justify an award for a lifelong injury where, although a doctor testified that the plaintiff suffered a permanent condition, "he did not testify that such a condition would cause any disability in performing the usual duties of his employment in the future" and there was "a total lack of proof that any permanent disability or damage resulted"); *Curtis*, 61 N.M. at 312, 299 P.2d at 781 (noting that the evidence was not sufficient to establish a permanent injury where there was "not one word of testimony by which the jury could make any allowance to [the] plaintiff for any life-long injury").

{49} In regard to loss of future earnings, Defendant asserts that Plaintiff's economic expert, Dr. Thomas David McKinnon, testified to two different values for lost earning capacity, based on two different assumptions: (1) An approximate $400,000 valuation based on the assumption that Plaintiff was unable to return to his pre-injury floorhand position; and (2) an approximate $600,000 valuation based on the assumption that Plaintiff remained at his job and would have been promoted about ten years after the date of the injury to the higher paying position of operator. Defendant then argues that the evidence was insufficient to support these results because Plaintiff failed to demonstrate with reasonable certainty that his injury was permanent and would prevent him from working as a floorhand in the future and also because he failed to demonstrate with reasonable certainty that he would have been promoted to the higher position of operator at Key Energy had he not been injured. Thus, Defendant argues, Plaintiff failed to demonstrate the existence of evidence to support either

14

of Dr. McKinnon's assumptions with reasonable certainty, and therefore his loss-of-future-earnings award was not supported by substantial evidence. Finally, Defendant asserts that the jury could only speculate as to whether Plaintiff would ever have reached the position of operator at Key Energy because Plaintiff did not present testimony of the likelihood of any promotions at Key Energy.

{50} Plaintiff submits that inferences can be drawn from the evidence presented and argues that Dr. Harmston's testimony shows that he has suffered "permanent muscle damage," "severely impaired" strength in his right leg, and will continue to experience pain and discomfort in his leg "when it rains or is cold outside . . . [for] the rest of his life." Based on a reasonable inference that the results of his FCE were final and conclusive at the time the FCE was completed, Plaintiff further argues that the extent of his recovery at the time of the FCE was the full extent of his recovery and that he would not make any further recovery. Plaintiff also argues that the jury was permitted to find that he could have reached the position of rig operator earning $85,000 a year, which was greater than Dr. McKinnon's figure of $61,000, and that Plaintiff's earnings in that position would be substantially greater than that proposed by Dr. McKinnon, thus substantially increasing Plaintiff's future loss of earnings beyond Dr. McKinnon's $600,000 figure. According to Plaintiff, the loss could increase his total loss to $955,634 if he worked to age sixty-five. Furthermore, Plaintiff argues, the jury could have figured in Plaintiff's loss of his own services over his life expectancy. Plaintiff suggests that the jury could have found, for example, "just five hours of loss of services per week" over Plaintiff's life expectancy, with a value of $20 per hour, and have arrived at a loss of $127,000 subject to reduction to present value; or, the jury could even have found twice that amount. In its reply brief, Defendant does not address those arguments. Plaintiff also argues in his brief, emphasized in his oral argument before this Court, that he presented evidence of substantial limitations on his former, active outdoor lifestyle.

{51} We have considered Defendant's arguments that Plaintiff's future pain and suffering was minimal and that the longevity of Plaintiff's work limitations that would prevent him from returning to work as a floorhand was questionable, if not speculative. We see no need and choose not to engage in comparisons with the circumstances in other cases cited by Defendant. To do so, invites unhelpful if not inappropriate reweighing and comparing of evidence. Following the rules by which we are to examine whether the amount of a jury verdict is justified by the evidence, we hold that the evidence was sufficient to justify the amount of the verdict and was not grossly out of proportion to the evidence. This is not an extreme case. And, to the extent a shocks-the-conscience analysis may be required, nothing about the verdict shocks our conscience. Furthermore, we hold that the court did not abuse its discretion in denying Defendant's motion for a new trial or remittitur on the issue of sufficiency of the evidence. The district court was not, as Defendant argues, required to determine that the evidence did not justify the amount of the verdict or that the verdict amount was out of proportion to the evidence or to Plaintiff's injury.

III. Defendant's Contention That the Verdict Was Based on Passion or Prejudice

**{52}** Defendant asserts that the damages award was excessive to a point not only that the evidence inadequacy shocked the conscience but that its excessive nature was likely, if not assuredly, to have resulted from improper closing argument comments, leaving room for no reasonable conclusion than that the verdict was unrelated to the evidence and was a result of passion or prejudice. In its amended order denying Defendant's motion for a new trial or remittitur, the district court determined, in part, that there was "no evidence that the verdict was influenced by passion, prejudice, partiality, sympathy, undue influence or any corrupt cause or motive."

**{53}** Under its passion-or-prejudice contention, in arguing abuse of discretion, Defendant relies on its brief in chief arguments in support of its first point on appeal that the verdict was not supported by substantial evidence. The purpose for this reliance is to show that the award could only have resulted from passion or prejudice generated by Plaintiff's counsel's closing argument. Because we have determined that the evidence justifies the amount of the verdict and that the verdict amount is not disproportionate to the evidence or injury and does not shock our conscience, we fail to see how Defendant can successfully maintain any argument grounded in passion or prejudice as a result of improper closing argument statements. For this reason, we reject as unfounded Defendant's second point in its brief in chief based on passion or prejudice.

**{54}** Nevertheless, in oral argument, Defendant argued that its passion-or-prejudice point was not dependent upon a determination of whether the evidence was sufficient to support or justify the amount of the verdict, referring to this Court's statement in *Gonzales*, 89 N.M. at 480, 553 P.2d at 1287, that "[i]f either of the [*Chavez*] tests [is] met, the award is excessive." The question whether Defendant's passion-or-prejudice point can survive as an independent basis for relief even after our holding that the evidence justified the award, was not disproportionate, and did not shock our conscience, causes us to turn to Defendant's challenge to the amount of the verdict based on Plaintiff's counsel's comments to the jury in closing argument and the alleged effect of those comments on the integrity of the verdict.

**{55}** Defendant claims that the improper comments (1) referred to matters in violation of a motion in limine granted by the district court restricting comment, (2) implored the jury to "send a message" to Defendant, (3) improperly implied that Plaintiff could not sue anyone other than Defendant, and (4) improperly misrepresented facts adduced at trial. Defendant contends that these improper arguments provide an explanation for the jury having gone outside the evidence to arrive at a verdict tainted by passion or prejudice. As to each of these issues, while it may be arguable that one or more of Plaintiff's counsel's statements were improper, Defendant did not adequately preserve the issue.

**{56}** Generally, a motion for a new trial cannot be used to preserve issues not otherwise raised during the proceedings. *See Goodloe v. Bookout*, 1999-NMCA-061, ¶ 13, 127 N.M. 327, 980 P.2d 652 (holding, in regard to complaints about improper restriction of cross-examination, that "[r]aising the matter in their motion for a new trial came too late; objections must be raised in time for the trial judge to correct the error to prevent prejudice"). In order to preserve an issue for appeal, Defendant must have made a timely and specific objection that apprised the district court of the nature of the claimed error and

16

that allows the district court to make an intelligent ruling thereon. *See State v. Varela*, 1999-NMSC-045, ¶ 25, 128 N.M. 454, 993 P.2d 1280; *see also* Rule 12-216(A) NMRA (requiring that "it must appear that a ruling or decision by the district court was fairly invoked" in order to preserve a question for review); *State v. Granillo-Macias*, 2008-NMCA-021, ¶ 11, 143 N.M. 455, 176 P.3d 1187 (holding that the defendant's argument on appeal was not properly preserved where there was no strict-compliance argument made to the lower court), *cert. denied*, 2008-NMCERT-002, 143 N.M. 665, 180 P.3d 672; *State v. Shirley*, 2007-NMCA-137, ¶¶ 31-32, 142 N.M. 765, 170 P.3d 1003 (determining that a defendant's argument on appeal pertaining to certain testimony was not properly preserved where the argument below did not sufficiently alert the district court to the argument raised on appeal to invoke an intelligent ruling), *cert. denied*, 2007-NMCERT-010, 143 N.M. 73, 172 P.3d 1285. The primary purposes for the preservation rule are: (1) to specifically alert the district court to a claim of error so that any mistake can be corrected at that time, (2) to allow the opposing party a fair opportunity to respond to the claim of error and to show why the court should rule against that claim, and (3) to create a record sufficient to allow this Court to make an informed decision regarding the contested issue. *State v. Lopez*, 2008-NMCA-002, ¶ 8, 143 N.M. 274, 175 P.3d 942 (filed 2007); *Diversey Corp.*, 1998-NMCA-112, ¶ 38.

**{57}** In cases involving improper closing argument, as when counsel "go outside the record . . . we reserve the right in a proper case to reverse the judgment and award a new trial even if objection be not made." *Griego v. Conwell*, 54 N.M. 287, 292, 222 P.2d 606, 609 (1950). However, this rule is to only be applied as a last resort and is not to be applied "unless we are satisfied that the argument presented to the jury was so flagrant and glaring in fault and wrongdoing as to leave the bounds of ethical conduct," such as going outside the record. *Grammer v. Kohlhaas Tank & Equip. Co.*, 93 N.M. 685, 693, 604 P.2d 823, 831 (Ct. App. 1979); *see Lopez v. Sw. Cmty. Health Servs.*, 114 N.M. 2, 8, 833 P.2d 1183, 1189 (Ct. App. 1992) (repeating the statements in *Grammer*); *see also Murphy v. Int'l Robotics Sys., Inc.*, 710 So. 2d 587, 591 & n.4 (Fla. Dist. Ct. App. 1998) (stating that the court's research indicated that other than in Florida, "no other courts in this country allow improper argument to be raised for the first time on appeal in civil cases," but noting that in *Griego* the New Mexico Supreme Court "warned that it would do so, but it has never carried out its threat"). Furthermore, while counsel making statements in closing argument have a responsibility to refrain from statements of fact outside of the record and to refrain from asserting reasons for the jury to reach a decision based on circumstances outside of the record, *Enriquez v. Cochran*, 1998-NMCA-157, ¶¶ 133, 135, 126 N.M. 196, 967 P.2d 1136, opposing counsel has a responsibility as does the district court "to keep the attorneys in the record while they address the jury." *Griego*, 54 N.M. at 291, 222 P.2d at 608.

**{58}** We determine here, as in *Griego*, that this case is not one that requires us to hold that the district court abused its discretion in denying Defendant's motion for a new trial that asserted the award was tainted by passion or prejudice. *See Kestenbaum*, 108 N.M. at 29, 766 P.2d at 289 (noting that *Griego* had recognized that improper argument could necessitate a new trial notwithstanding a failure to object, but determining that the complaining party failed to satisfy its "burden to demonstrate to the trial court that its rights were prejudiced because the argument was improper," and noting that in denying a motion for new trial, "the court opined that had [the party] timely objected[,] a curative instruction could have been

17

conveyed to the jury"). We believe that if defense counsel had timely and specifically objected and had requested and received an appropriate curative instruction and/or admonition, the issue would not now be in this Court. *See id.* (indicating that "any objections to counsel's argument should be timely made, unless they are of such [a] serious nature that a cautionary instruction would not cure the error").

**{59}** It is important to note that on the question of jury deliberations, we presume jurors abide by the court's instructions. *State v. Benally*, 2001-NMSC-033, ¶ 21, 131 N.M. 258, 34 P.3d 1134; *State v. Smith*, 2001-NMSC-004, ¶ 40, 130 N.M. 117, 19 P.3d 254; *State v. Case*, 100 N.M. 714, 719-20, 676 P.2d 241, 246-47 (1984); *State v. Sellers*, 117 N.M. 644, 650, 875 P.2d 400, 406 (Ct. App. 1994). In this case, the jury was given the following instructions.

> [Instruction No. 2:] The law of this case is contained in these instructions and it is your duty to follow them. You must consider these instructions as a whole, not picking out one instruction, or parts thereof, and disregarding others.

> [Instruction No. 14:] . . . . Whether the evidence has proved any of these elements of damages is for you to determine. Your verdict must be based upon proof and not upon speculation, guess or conjecture.

> Further, sympathy or prejudice for or against a party should not affect your verdict and is not a proper basis for determining damages.

> [Instruction No. 31:] You are the sole judges of all disputed questions of fact in this case. It is your duty to determine the true facts from the evidence produced here in open court. Your verdict should not be based on speculation, guess or conjecture.

> You are to apply the law, as stated in these instructions, to the facts as you find them and, in this way, decide the case. Neither sympathy nor prejudice should influence your verdict.

With these instructions in his argument tool kit, defense counsel could have woven Plaintiff's counsel's improper comments not only into emphasis on any curative instruction, but also into emphasis on the foregoing instructions in an effort to persuade the jurors to reject Plaintiff's counsel's closing argument. We turn to Defendant's specific complaints about Plaintiff's counsel's closing argument.

**A.      Comments That Allegedly Violated an Order on a Motion in Limine**

**{60}** Defendant's motion in limine sought to exclude, among other things, evidence of its policies, manuals, or protocols regarding the appropriate method of bleeding-off pressure from the tool at issue, and evidence of other accidents involving Defendant or any other company producing or employing pressure-setting devices. Defendant asserts that Plaintiff's

counsel intentionally introduced prejudicial evidence through his closing argument in violation of an order and an agreement to disallow certain evidence. Defendant complains, too, that the comments had the practical effect of misleading and confusing the jury because they were not based on the evidence adduced during trial. Defendant also argues that because the comments occurred in closing argument, it had no opportunity to present evidence or witnesses to counter or rebut them.

**{61}** We first discuss the hearing on the motion in limine. Defendant contends in its brief in chief in one place that the district court granted that part of the motion relating to policies, manuals, and protocols, and that Plaintiff independently agreed with Defendant as to that part of the motion relating to accidents. Yet in another place in its brief in chief Defendant contends that the court granted the motion as to both issues. Plaintiff counters that the parties mutually agreed to certain matters of evidence, but that there was no court ruling on the motion and no order entered. According to Plaintiff, all he "agreed to do was not mention that [Defendant] had failed to produce documents concerning its policies, manuals and protocols, mention that [Defendant] had failed to produce the . . . tool for inspection, or mention similar accidents involving [Defendant] or anyone else." In its reply brief, Defendant acknowledges that the court did not expressly state that it was granting its motion and relies instead on what "the practical import of the discussions between the parties and [the] court indicated." Defendant concedes that the transcript of the pretrial conference "is not a model of clarity," but asserts that it was nevertheless "apparent from the discussions between the parties and the court that [Defendant's] motion to exclude evidence of its policies, manuals, or protocols regarding appropriate methods to bleed pressure from the tool at issue was granted[] or, at a minimum, acquiesced to by Plaintiff." After setting out the discussions, Defendant ends by stating that, based on the "practical import of the discussions," its motion "was implicitly granted by the court," and Defendant asserts that Plaintiff violated "the agreed-upon motion."

**{62}** Defendant contends on appeal that during closing argument Plaintiff's counsel improperly stated that Defendant lacked a safety policy or procedure for operating the tool and that Defendant's failure to have such a policy was reprehensible. Defendant further contends that Plaintiff's counsel improperly argued that the jury should consider the numerous times the tool must have failed in other locations in determining fault and the appropriate measure of damages. However, as to this latter contention, it is unclear what statements Defendant is referring to and Defendant does not specify what they are.

**{63}** We will not attempt to unscramble the ambiguous and confusing circumstances or to pick out the statements as to which Defendant complains but does not set out with particularity. In our view, Defendant has not presented on appeal a clear and developed record that permits us to hold that Plaintiff's counsel's closing argument was improper. As well, Defendant does not explain why its counsel could not have rebutted any statements that might leave a false impression with the jury, or why its counsel did not raise an objection with the court and seek an effective admonition or curative instruction. Defendant does not indicate that it objected during the closing argument to the statements about which it complains. We see no objections in the record. We think this is an instance in which

19

Defendant should have preserved the issue in order to raise it on appeal. We therefore do not address it further.

**B.      Asking the Jury to "Send a Message"**

**{64}**      In his closing argument, Plaintiff's counsel stated:

> You have the power to decide cases, that's the way our country works. You have the power to send a message. You have the power to change things. You can do more by your verdict than just settling the dispute between a man and a service company. You can actually make things safer in the oilfield.

Defendant argues that these statements were improper and prejudicial because they urged the jury to reach a verdict for reasons other than the evidence presented at trial. *See State v. Cooper*, 2000-NMCA-041, ¶¶ 14-15, 129 N.M. 172, 3 P.3d 149 (stating that "[p]rosecutorial commentary that urges a jury to convict for reasons other than the evidence defies the law and undermines the integrity of a verdict"). Defendant also asserts that the statements did nothing more than appeal to passion and prejudice, because such statements would be proper, if at all, only to punish a party where punitive damages were at issue. Defendant further complains that these comments were made as Plaintiff was arguing how to calculate pain and suffering and other damages. Plaintiff's response is that whether a "send a message" comment is improper "depends on the message itself."

**{65}**      Defendant appears to have made some sort of objection to the statements in question, but the record does not reflect what the objection was or any discussion among court and counsel about the objection or the statement. Neither the briefs nor the record reflect a court ruling or any request by Defendant for a curative instruction. We do not know what Defendant argued. We do not know whether the court agreed with whatever Defendant's objection was and whether the parties and court discussed a curative instruction. It is the duty of the appellant to provide a record adequate to review the issues on appeal. *Williams v. Bd. of County Comm'rs*, 1998-NMCA-090, ¶ 10, 125 N.M. 445, 963 P.2d 522. "Upon a doubtful or deficient record, every presumption is indulged in favor of the correctness and regularity of the trial court's decision, and the appellate court will indulge in reasonable presumptions in support of the order entered." *Reeves v. Wimberly*, 107 N.M. 231, 236, 755 P.2d 75, 80 (Ct. App. 1988).

**{66}**      We choose not to review this issue. *See* Rule 12-216(A); *Varela*, 1999-NMSC-045, ¶ 25; *Granillo-Macias*, 2008-NMCA-021, ¶ 11; *Shirley*, 2007-NMCA-137, ¶¶ 31-32; *Goodloe*, 1999-NMCA-061, ¶ 13. "Objections should be made in time for the trial court to rule on them and to correct them, where it is possible to correct them by a cautionary instruction before the jury retires." *Grammer*, 93 N.M. at 693, 604 P.2d at 831.

**C.      Implication that Plaintiff Could Not Sue Anyone Else**

20

**{67}**   As Plaintiff's counsel was arguing comparative fault among Defendant, Key Energy, and Precision, he asked the jury to hold Defendant solely at fault.  The full context of the argument was as follows:

> As far as Mr. Brittenham and [Defendant's] blaming every single person out there for this, I hope that I did not make a mistake by not suing everybody else that was out there.  I hope that I was correct in filing the lawsuit against the company that evidence appeared to be solely at fault because if I had done otherwise, if I had thrown a net over everybody else that was out there, we would not only have [Defendant] sitting there but we would have maybe three more defendants and three more lawyers sitting over there and we'd end up with more lawyers in this courtroom than jurors.  We just should not sue everybody in sight because something bad happened.  Somebody should not be brought to court and should not be put on trial unless there's evidence and substantial evidence against them.  When this happened, everybody out there knew who was at fault.  Everybody out there knew who was responsible. They knew [whose] tool it was, who was running it and then we get the lawyers and all our experts, and we hired experts too and things get more and more complicated.  This case should end up the way it started out.  Like what everybody knew when it started out.  That this was [Defendant's] fault.

**{68}**   Defendant complains in particular about the statement, "I hope that I did not make a mistake by not suing everybody else that was out there."  Defendant argues that "[i]n making this plea, counsel implied, falsely, that the statute of limitations barred him from suing other parties."  Defendant also argues that the statement was an improper exhortation "to not find that Plaintiff had made a costly mistake by only suing [Defendant]—the clear implication from this statement being that Plaintiff had to recover in this lawsuit, or not at all."  The impropriety here, Defendant argues, is that Plaintiff was asking the jury to find in Plaintiff's favor for reasons other than the evidence presented at trial.

**{69}**   We again choose not to address the issue.  Defendant does not indicate where it preserved this issue in the district court by objecting and invoking a court ruling and, if called for, by seeking a curative instruction or other relief.  *See* Rule 12-216(A); *Varela*, 1999-NMSC-045, ¶ 25; *Granillo-Macias*, 2008-NMCA-021, ¶ 11; *Shirley*, 2007-NMCA-137, ¶¶ 31-32; *Goodloe*, 1999-NMCA-061, ¶ 13; *Grammer*, 93 N.M. at 693, 604 P.2d at 831.

## D.      Misrepresentation of Facts

**{70}**   Plaintiff's counsel stated in argument that Plaintiff would have a deep ache in his leg every time it rains, plus muscle pain because of the extensive muscle damage and scarring.  In addition, counsel argued that Plaintiff had "flunked the FCE and they wouldn't let him go back."  Thus, Defendant contends that counsel misrepresented facts by arguing that Dr. Harmston and Mr. Ryan found that Plaintiff had current, permanent muscle and/or tissue damage to his leg and that Plaintiff had reached full, maximum capacity when the FCE was

21

performed. Defendant argues that Plaintiff improperly "insinuated that his condition was static and would not improve."

**{71}** To show the misrepresentation, Defendant asserts that, while Dr. Harmston noted that Plaintiff suffered some muscle and/or tissue damage at the time of the injury, he did not testify that such damage was permanent. Defendant further points out that Mr. Ryan stated that he did not do any analysis to determine whether Plaintiff suffered any type of permanent muscle injuries and that he would defer to a physician to make that determination. Defendant also argues that the testimony of Dr. Harmston and Mr. Ryan indicated that, in their view, Plaintiff may not have reached full, maximum capacity when the FCE was performed.

**{72}** Once again, Defendant does not indicate where it preserved this issue below by objecting and obtaining a ruling and, if called for, by seeking a curative instruction or other relief, and we choose not to address the issue. *See* Rule 12-216(A); *Varela*, 1999-NMSC-045, ¶ 25; *Granillo-Macias*, 2008-NMCA-021, ¶ 11; *Shirley*, 2007-NMCA-137, ¶¶ 31-32; *Goodloe*, 1999-NMCA-061, ¶ 13; *Grammer*, 93 N.M. at 693, 604 P.2d at 831.

## IV. The Issue of Post-Judgment Interest

**{73}** The district court awarded Plaintiff post-judgment interest at the rate of 15%. The controlling statute on post-judgment interest, NMSA 1978, § 56-8-4(A)(2) (2004), states that post-judgment interest is awarded from the date of entry of the judgment at the rate of 8.75%, unless "the judgment is based on tortious conduct, bad faith or intentional or willful acts, in which case interest shall be computed at the rate of fifteen percent." Defendant contends that it was error to award the higher rate of interest because there was no evidence of intentional or willful acts, and tortious conduct can refer only to deliberate tortious conduct and not to mere negligence. This interpretation, Defendant argues, is reinforced by the text of Section 56-8-4(A)(2), which places "tortious conduct" in the same category and breath as "bad faith," "intentional," or "willful acts." Citing William L. Prosser, *Handbook on the Law of Torts* § 6, at 29-30 (4th ed. 1971), Defendant notes that under English common law, "torts" did not include mere negligence, but instead involved forcible, direct, and willful injuries. Defendant argues that the legislative purpose underlying the 15% rate was to provide for a penalty when a defendant acts culpably. *See Pub. Serv. Co. of N.M. v. Diamond D Constr. Co.*, 2001-NMCA-082, ¶ 55, 131 N.M. 100, 33 P.3d 651 (observing that the increased rate in Section 56-8-4(A)(2) was an "increased penalty" warranted "when the facts of a particular case show that the defendant has acted culpably . . . and therefore may be in need of additional encouragement to timely pay the judgment debt owed to the plaintiff"). Defendant thus urges this Court to determine that the legislative purpose underlying the elevated interest rate was to apply to more blameworthy conduct than mere negligence, and to reach any other conclusion would render application of the statute absurd or unreasonable, as well as unconstitutional for lack of any rational or principled basis.

**{74}** We review the award of post-judgment interest for abuse of discretion. *Pub. Serv. Co. of N.M.*, 2001-NMCA-082, ¶ 60. A court can abuse its discretion by misapprehending or misapplying the law. *N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶ 7,

127 N.M. 654, 986 P.2d 450; *Klinksiek*, 2005-NMCA-008, ¶ 4; *State v. Elinski*, 1997-NMCA-117, ¶ 8.

**{75}** While Defendant makes an arguable point, we must look to the plain meaning of the term. "Tortious" stems from "tort," and negligence is considered a tort in American jurisprudence. Note, for example, our statement in *Public Service Co. of New Mexico*, 2001-NMCA-082, ¶ 58:

> "Tortious conduct" has been defined as an act or omission that subjects an individual to liability under the principles of tort law. In tort law, conduct may be actionable whether the actor intends harm or not. Nonetheless, the most common of the tort causes of action require a finding that a defendant acted negligently, recklessly, or intentionally.

(Citations omitted.)

**{76}** Our long-arm statute, NMSA 1978, § 38-1-16(A)(3) (1971), states that a person submits himself to the jurisdiction of the court as to "any cause of action arising from . . . the commission of a tortious act within this state." There is no question that a cause of action arising from commission of a negligent act constitutes the commission of a tortious act under this statute. *See, e.g.*, *Roberts v. Piper Aircraft Corp.*, 100 N.M. 363, 366, 670 P.2d 974, 977 (Ct. App. 1983) (holding that "when negligent acts occur outside New Mexico which cause injury within New Mexico, a 'tortious act' has been committed within this state"). We are further guided by usage in reliable sources as to the meaning of words. For example, we read in *Restatement (First) of Torts* § 6 (2008) that "[t]he word 'tortious' is used throughout the Restatement of this Subject to denote the fact that conduct whether of act or omission is of such a character as to subject the actor to liability under the principles of the law of Torts." Under its first comment, the Restatement clarifies that

> The word "tortious" . . . is appropriate to describe not only an act which is intended to cause an invasion of an interest legally protected against intentional invasion or conduct which is negligent as creating an unreasonable risk of invasion of such an interest, but also conduct which is carried on at the risk that the actor shall be subject to liability for harm caused thereby, although no such harm is intended and the harm cannot be prevented by any precautions or care which it is practicable to require.

*Id.,* cmt. a. We note that *Restatement (Second) of Torts* § 6 (2008) repeats what was stated in the prior Restatement.

**{77}** Dictionary definitions also indicate that "tortious" includes negligent conduct. *Webster's* defines "tortious" as "implying or involving" a tort and defines "tort" as "a wrongful act other than a breach of contract for which relief may be obtained in the form of damages or an injunction." *Merriam-Webster's Collegiate Dictionary* 1245, 1246 (10th ed. 1996). *Black's* defines "tortious" as "[c]onstituting a tort; wrongful" and defines "tort" as "[a] civil wrong." *Black's Law Dictionary* 1526, 1527 (8th ed. 2004). Under "tort," *Black's*

23

lists several types of tort, including "negligent tort." *Id*. *Black's* defines "negligence" as a "tort" grounded in "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation." *Id.* at 1061. These definitions do not indicate that either "tort" or "tortious" means only intentional or willful conduct or implies bad faith.

{78}     Defendant's arguments make sense given the placement of Section 56-8-4(A)(2) in Chapter 56 entitled "Commercial Instruments and Transactions" and Article 8 entitled "Money, Interest and Usury," and also given the inclusion of "tortious conduct," along with "bad faith" and "intentional or willful acts." Nevertheless, we cannot escape the fact that the Legislature's use of the word "tortious" in the interest statute must be considered in plain and customary usage to mean an act that constitutes a tort. Negligence comes within that meaning, as it is considered a tort. We therefore are not prepared to interpret the statute as Defendant asks us to do. We think that it is up to the Legislature to revisit whether it intends to penalize negligence with the 15% post-judgment rate. We must presume that in amending Section 56-8-4(A) in 1983 with a 15% interest rate, the Legislature was aware of the use of the word "tortious" as including the word "negligence." *Compare* 1980 N.M. Laws, ch. 68, § 2, *with* 1983 N.M. Laws, ch. 254, § 2. We hold that the district court did not err in awarding interest at 15%.

**CONCLUSION**

{79}     We hold that the district court did not abuse its discretion in denying Defendant's motion for a new trial or remittitur. We affirm the verdict. We further hold that the district court did not err in awarding post-judgment interest at 15%.

{80}     **IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**CELIA FOY CASTILLO, Judge**

_____
**RODERICK T. KENNEDY, Judge**

**Topic Index for *Sandoval v. Baker Hughes Oilfield Operations, Inc.*, No. 28,266**

**AE**               **APPEAL AND ERROR**
AE-PA                 Preservation of Issues for Appeal

| | |
|---|---|
| **AT** | **ATTORNEYS** |
| AT-CT | Comments by Attorneys at Trial |
| | |
| **CP** | **CIVIL PROCEDURE** |
| CP-MN | Motion for New Trial |
| CP-RM | Remittitur |
| | |
| **EV** | **EVIDENCE** |
| EV-SS | Substantial or Sufficient Evidence |
| | |
| **JM** | **JUDGEMENT** |
| JM-IN | Interest |
| | |
| **JI** | **JURY INSTRUCTION** |
| JI-CI | Civil Jury Instructions |
| | |
| **NG** | **NEGLIGENCE** |
| NG-PI | Personal Injury |
| | |
| **RE** | **REMEDIES** |
| RE-EC | Earning Capacity |
| RE-EX | Excessive Damages |
| RE-FD | Future Damages |
| RE-MD | Measure of Damages |
| RE-PS | Pain and Suffering |
| | |
| **TR** | **TORTS** |
| TR-TG | Torts, General |