This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**ADVANTAGE DRILLING, LLC,**

Plaintiff-Appellee,

v.                                          **NO. 30,845**

**MAYAN CONSTRUCTION, INC.,**

Defendant-Appellant,

**GRANITE RE, INC.,**

Defendant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Ted Baca, District Judge**

Bingham, Hurst & Apodaca, P.C.
Lillian G. Apodaca
Albuquerque, NM

for Appellee

Lorenz Law
Alice T. Lorenz
Albuquerque, NM

for Appellant

**MEMORANDUM OPINION**

**WECHSLER, Judge.**

{1}     Appellant Mayan Construction Inc. (Mayan) appeals the district court's order awarding Appellee Advantage Drilling, LLC (Advantage) $62,959.59 for breach of contract. On appeal, Mayan argues that (1) the district court erred in awarding contract damages because it did not find or conclude that Mayan had breached any contract, and further, that insufficient evidence supported any finding or conclusion that Mayan breached a contract; (2) the district court erred to the extent that it based the damages award on an unjust enrichment theory; and (3) the district court erred in ordering Mayan to reimburse Advantage for half of the cost of construction materials purchased and retained by Mayan and requiring Mayan to act jointly with Advantage in disposing the construction materials for Mayan's failure to mitigate the damages relating to the cost of the construction materials. We affirm in part and reverse in part.

**BACKGROUND**

{2}     Mayan filed two actions in the district court: (1) an action to cancel a lien on public property by Advantage and (2) a declaratory judgment action to declare the lien invalid. After Granite RE, Inc. issued a lien release bond and the lien was cancelled,

2

Advantage filed a complaint for damages in the lien cancellation action against Mayan, asserting claims for (1) breach of contract, (2) breach of a settlement agreement, (3) judgment under the lien statutes, (4) breach of the covenant of good faith and fair dealing, (5) judgment against the bond, and (6) unjust enrichment or quantum meruit. The proceedings following Advantage's complaint for damages are the subject of this appeal.

{3}     The circumstances of this case arose in connection with a project known as the Isleta Drain Project (the Project).  Engineered Structures, Inc. (ESI) was the general contractor of the Project.  In January 2006, ESI and Mayan entered into a subcontract for Mayan to perform work on the Project, including dewatering the area and drilling secant holes to support dirt work around the Project area.

{4}     Mayan and Advantage negotiated in late 2005 and early 2006 for Advantage to subcontract to drill dewatering holes in the channel and secant holes under the road. The negotiations culminated in Advantage submitting two proposals: one for drilling eight dewatering holes (18 inches in diameter and 60 feet deep) and another for drilling two hundred and eighty secant holes.

{5}     Mayan and Alan Regis, the qualifying and financially responsible agent for Advantage, had done business together for years and had never entered into a written contract for work performed.  Breaking with this past practice, Advantage asked

3

Mayan for a written subcontract, which Mayan drafted and provided to Advantage for review. Although the parties agreed to the price and services that Advantage was to perform, the parties never reached an agreement on all the terms contained in the subcontracts, and the parties never signed written subcontracts for either proposal.

{6} Despite not having agreed to the written subcontracts, on or about January 24, 2006, with Mayan's consent, Advantage mobilized for the Project by moving several pieces of equipment and its drill to the Project site. Advantage began drilling on February 1 and continued on February 2 and 4. During the three days, Advantage worked on drilling either two or four of the holes and only achieved a depth of ten feet before the holes collapsed.

{7} On February 2, 2006, Advantage advised Mayan that Advantage did not agree to the terms proposed in the two subcontracts that Advantage had requested, that Advantage needed documents to review, and that Advantage had "no choice but to stop work until these issues were resolved." Advantage subsequently left the Project site and did not continue drilling on February 3, 2006, and Mayan believed that Advantage had abandoned the Project. After Advantage stopped work on the Project, Mayan contacted two other companies inquiring whether they could perform the dewatering drilling and secant drilling.

{8} Advantage moved the drill back to the job site and continued drilling on

4

Saturday, February 4, 2006 as well as Monday, February 6, 2006. On February 4, 2006, a principal of Mayan went to the job site and asked Advantage to stop drilling and asked to buy out the "contracts." After Advantage indicated that it wished to continue working on the Project, Mayan informed Advantage "to reconsider it and to think about it." On February 6, 2006, Advantage "went back to drilling," and Mayan again asked to buy out the contract. Later that day, Mayan wrote a letter to Advantage proposing to dissolve any verbal agreements between Advantage and Mayan concerning the drilling and agreeing to disburse $309,000 over the course of several months. That same day, Advantage wrote to Mayan rejecting the offer but proposing different terms. On February 8, 2006, Advantage wrote back to Mayan, again not accepting Mayan's previous offer. On February 13, 2006, Advantage provided Mayan a "settlement agreement" proposing several different terms from those in the February 6, 2006 proposal drafted by Mayan. Mayan rejected the proposed settlement agreement.

{9}     The district court found that there was never a lawful contract, or written settlement agreement, signed by both parties, which would require Mayan to pay Advantage $309,000 or any other sum. The district court did, however, find that the parties entered into the two subcontracts for dewatering and secant drilling, despite acknowledging that the parties did not sign the written agreements and disagreed

5

about the inclusion of certain terms. The district court found that Mayan breached the subcontracts and awarded damages for mobilization expenses, labor expenses, a one-month rental of a drill rig, overhead costs, lost profit, security, and the cost of gravel, which totaled $43,089.09. The district court also found that Advantage expended $39,741.00 for construction materials for the Project. It found that both parties failed to mitigate damages with respect to the construction materials and ordered that Mayan reimburse Advantage for fifty percent of the cost, $19,870.50, and that the parties, as joint owners, may agree to the final disposition of the materials. Mayan appeals.

**BREACH OF CONTRACT**

{10}     Mayan argues that the district court erred in awarding damages against Mayan when it neither found nor concluded that Mayan had breached any contract, and further, that the evidence did not support any finding or conclusion that Mayan breached a contract. Advantage advanced two contract claims in its complaint. First, Advantage alleged that it entered into an enforceable settlement agreement that obligated Mayan to pay Advantage for the costs incurred in attempting to drill the secant and dewatering holes, as well as the anticipated lost profits. Second, Advantage alleged that it had underlying subcontracts with Mayan to perform the dewatering and secant drilling. The district court found that the parties never entered into an enforceable contract regarding settlement. The district court did, however,

6

find that Mayan and Advantage entered into the two subcontracts, in which Advantage agreed to drill eight dewatering holes and two hundred and eighty secant holes. Mayan argues that there was not sufficient evidence to support the district court's finding that Mayan and Advantage entered into the two subcontracts. Mayan contends that, although the parties had the initial intent to contract, no enforceable contract was formed because the parties failed to agree on a number of terms that Advantage considered material to any agreement, leading Advantage to reject the written subcontracts.

{11}    In addressing the sufficiency of the evidence, "[i]f the verdict below is supported by substantial evidence, which we have defined as such relevant evidence that a reasonable mind would find adequate to support a conclusion, we will affirm the result." *Weststar Mortg. Corp. v. Jackson*, 2003-NMSC-002, ¶ 8, 133 N.M. 114, 61 P.3d 823 (internal quotation marks and citation omitted). We review the evidence in a light favoring the verdict and resolve conflicts in favor of the prevailing party. *Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 12, 146 N.M. 853, 215 P.3d 791. "It is not the task of a reviewing court to sit as a trier of fact or to reweigh the evidence." *Weststar Mortg. Corp.*, 2003-NMSC-002, ¶ 8. We turn to whether sufficient evidence supported the finding that the parties entered into the two subcontracts for dewatering and secant drilling.

**{12}** In order to form a contract, the technical requirements for contract formation include an objective manifestation of mutual intent formed by a legal offer and acceptance of the material terms of the contract. *Pope v. Gap, Inc.*, 1998-NMCA-103, ¶ 11, 125 N.M. 376, 961 P.2d 1283. A contract can be express or implied. *See Orion Technical Res., LLC v. Los Alamos Nat'l Sec., LLC*, 2012-NMCA-097, ¶ 9, 287 P.3d 967. We have stated that "[i]mplied-in fact contracts are founded upon a meeting of minds, which, although not embodied in an express contract, is inferred from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Id.* (alteration, internal quotation marks, and citation omitted). "Our courts will . . . look to written representations, oral representations[, and] the conduct of the parties . . . to determine whether an implied-in-fact contract exists." *Id.* ¶ 10 (alterations, internal quotation marks, and citation omitted). An implied-in-fact contract can be created by the representations of a party when the representations create a reasonable expectation of contractual rights. *Id.*

**{13}** In arguing that insufficient evidence supported the district court's finding that the parties entered into subcontracts, Mayan points to testimony and the district court's factual findings that Mayan and Advantage never entered into written subcontracts because the parties failed to agree to certain terms. Mayan also points to testimony from one of the principals of Advantage that the terms about which the

8

parties disagreed were sufficiently material so that there was no objective manifestation of assent to the subcontracts.

{14}    The testimony at trial indicates that after Advantage submitted its two proposals, Mayan informed Advantage that Advantage had been awarded the job and that Advantage should begin ordering the necessary materials and supplies for the drilling. Advantage asked Mayan to sign the proposals. Mayan informed Advantage that it was not its practice to sign off on proposals but that it would prepare subcontracts. While Mayan prepared the subcontracts, Advantage began mobilizing for the Project, including moving its drilling rig, backhoe, dump truck, service truck with a welder, and office trailer to the job site.

{15}    Mayan finished preparing the subcontracts, signed them, and faxed them to Advantage to sign. Advantage did not sign the subcontracts and instead made a few handwritten changes to the subcontracts regarding indemnification language and the work schedule and then sent them back to Mayan for approval. In turn, Mayan changed wording in the subcontracts, to which Advantage orally agreed. Although the parties then met to sign the subcontracts on January 31, 2006, the subcontracts were never signed.

{16}    Despite the lack of written subcontracts, Advantage began work on the Project on Wednesday, February 1, 2006. Advantage began drilling the dewatering holes and

9

continued though Thursday, February 2, 2006. On Friday, February 3, 2006, Advantage stopped work because the contract issues were not fully resolved and it had to change the oil in the upper engine of the drill, a task that needed to be done off the job site. Advantage moved the drill back to the job site and continued drilling on Saturday, February 4, 2006, as well as Monday, February 6, 2006. Although the parties never signed the written subcontracts, both parties' conduct, particularly Advantage beginning the drilling with Mayan's approval, is sufficient evidence to support a finding that the parties entered into the subcontracts under an implied-in-fact contract theory. *See Orion Technical Res., LLC*, 2012-NMCA-097, ¶ 9 (stating that implied-in-fact contracts are "inferred from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding" (alteration, internal quotation marks, and citation omitted)).

{17} Additionally, despite arguing that no subcontracts existed, the record contains testimony that Mayan recognized that the parties had entered into subcontracts for Advantage to drill the dewatering and secant holes. For example, on February 4, 2006, a principle of Mayan went to the job site and asked Advantage to stop drilling and asked to buy out the "contracts." After Advantage indicated that it wished to continue working on the Project, Mayan informed Advantage "to reconsider it and to think about it." On Monday, February 6, 2006, Advantage "went back to drilling,"

10

and Mayan again asked to buy out the contract. Advantage informed Mayan that it would agree to a buyout for $309,000, and Mayan agreed. Mayan's conduct therefore supports a finding of an implied-in-fact contract. *Id.* ¶ 10 (stating that our courts will look to the parties' representations and conduct to determine whether an implied-in-fact contract exists).

{18} We hold that sufficient evidence supports the district court's finding that Mayan and Advantage entered into subcontracts for Advantage to drill the dewatering and secant holes for the Project and that, therefore, there is sufficient evidence to support the award for reasonable costs incurred under the subcontracts. *See Sunnyland Farms, Inc. v. Cent. N.M. Elec. Co-op., Inc.*, 2013-NMSC-__, ¶ 11, __ P.3d __ (No. 32,968, Apr. 18, 2013) (stating "that in an action for breach of contract, the breaching party is justly responsible for all damages flowing naturally from the breach." (internal quotation marks and citation omitted)). As a result, it is not necessary to address the unjust enrichment issue.

**DAMAGES FOR CONSTRUCTION MATERIALS**

{19} Mayan next argues that the district court erred in awarding Advantage damages for construction materials that Advantage retained because Advantage never asserted a failure to mitigate defense and there was no other basis upon which to require Mayan to pay for Advantage's materials or to act jointly with Advantage to dispose

11

of those materials. The district court conclusion of law number 9 states that

> Both parties failed to mitigate damages with respect to the $39,741.00 of materials Advantage purchased for the Project. Mayan shall reimburse Advantage fifty (50%) of the cost, a sum of $19,870.50 for the materials. Then, as joint owners, they may agree as to the final disposition of the materials. If no agreement is reached, the materials shall be sold at a commercially reasonable sale and the proceeds split equally between the parties.

{20} Mayan appears to challenge this conclusion requiring it to mitigate damages for the purposes of arguing that the district court did not have authority to order it to act jointly with Advantage to dispose of the materials. "The question of the standards pursuant to which an award of damages may be made in a particular case is a question of law that we review de novo." *Montoya v. Pearson*, 2006-NMCA-097, ¶ 5, 140 N.M. 243, 142 P.3d 11. Mayan also challenges the sufficiency of the evidence supporting the district court's finding that Advantage is entitled to $19,870.50 for construction materials expended on the project. We review this argument under a substantial evidence standard. *See Weststar Mortg. Corp.*, 2003-NMSC-002, ¶ 8.

{21} "The legal rule of mitigation is designed to discourage persons against whom wrongs have been committed from passively suffering economic loss which could be averted by reasonable efforts, or from actively increasing such loss where prudence requires that such activity cease." *Powers v. Miller*, 1999-NMCA-080, ¶ 18, 127 N.M. 496, 984 P.2d 177 (internal quotation marks and citation omitted). Mitigation

of damages is an affirmative defense, and the party asserting mitigation of damages has the burden of proof. *Hickey v. Griggs*, 106 N.M. 27, 29, 738 P.2d 899, 902 (1987). Mitigation of damages is available to the party accused of the breach of contract or tortious conduct. *See id.*; *see also* UJI 13-1811 NMRA ("In fixing the amount of money which will reasonably and fairly compensate [the] plaintiff, you are to consider that *an injured person* must exercise ordinary care to minimize or lessen [his] [her] damages." (emphasis added)).

{22} As Mayan points out, Mayan did not assert any counterclaim against Advantage and did not assert that it was entitled to damages for any wrongful conduct by Advantage. Additionally, the district court did not enter any finding or conclusion that Advantage breached the subcontracts or otherwise engaged in wrongful conduct that entitled Mayan to damages. As the breaching party, Mayan was not required to mitigate the damages suffered by Advantage. Mitigation of damages is an affirmative defense that is asserted by the breaching party as a way to alleviate damages against an injured party. *See* UJI 13-1811; *see also Hickey*, 106 N.M. at 29, 738 P.2d at 902. There is therefore no basis to support the district court's conclusion that Mayan must purchase half the construction materials and then work jointly with Advantage to dispose of the materials, because this conclusion appears based on the district court's finding that Mayan did not mitigate the damages.

{23} Mayan next challenges the sufficiency of the evidence for the district court's conclusion that Advantage was entitled to damages for $39,741.00, which the district court reduced by half, to $19,870.50, due to the failure of either party to mitigate. As Mayan points out, although there was sufficient evidence to support a finding that Advantage purchased construction materials for the Project for $39,741.00, there is no evidence that the construction materials that Advantage retained had diminished in value or that the $39,741.00 or $19,870.50 reflects the actual reasonable loss suffered by Advantage. Advantage, likewise, does not point to any evidence in the record to support findings that $39,741.00 or $19,870.50 reflected the actual loss suffered by Advantage.

{24} Regis appears to be the only witness who testified regarding the construction materials, the cost, and the loss suffered by Advantage from Mayan's breach. He testified that he ordered materials for the Project, that he believed the materials belonged to Mayan once Mayan breached the subcontracts, and that he never attempted to return the materials for restocking. He additionally testified that he was unsure whether he could have returned some of the materials because they were "special ordered." Mayan's counsel attempted to impeach Regis' testimony by presenting Regis' deposition testimony, in which Regis stated that he was "sure" that some of the materials could be returned with a restocking fee of ten percent and that

14

even the "special ordered" materials "might have" been returnable. The testimony simply does not support a finding by a reasonable factfinder that Advantage suffered a total loss and therefore was entitled to damages for the entire purchase price of the materials it retained. *See Weststar Mortg. Corp.*, 2003-NMSC-002, ¶ 8. We therefore reverse the district court's award of $19,870.50 for construction materials.

**CONCLUSION**

{25}     Substantial evidence supports the district court's finding that Mayan and Advantage entered into subcontracts for Advantage to drill the dewatering and secant holes for the Project and its award of reasonable costs incurred under the subcontracts. However, the district court erred in finding that Mayan failed to mitigate the damages for the construction materials purchased by Advantage and the award for $19,870.50 for construction materials is not supported by substantial evidence. Accordingly, we affirm in part and reverse in part.

{26}     **IT IS SO ORDERED.**

_____
**JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____

**RODERICK T. KENNEDY, Chief Judge**

_____

**M. MONICA ZAMORA, Judge**