# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>December 21, 2018</u>

**No. A-1-CA-34744**

**LASEN, INC., and LASEN ALPIS, LLC,**

Plaintiffs-Appellees,

v.

**BORIS TADJIKOV,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Manuel I. Arrieta, District Judge**

Lilley and O'Connell, P.A.
Jerome O'Connell
Erin O'Connell
Las Cruces, NM

Joel T. Newton, P.A.
Joel T. Newton
Las Cruces, NM

for Appellees

L. Helen Bennett, LLC
L. Helen Bennett
Albuquerque, NM

E.F. Messett, LLC
Edward F. Messett
Albuquerque, NM

for Appellant

**OPINION**

**KIEHNE, Judge.**

{1}    Defendant Boris Tadjikov, Ph.D. appeals from a judgment awarding damages to his former employer, Plaintiff Lasen, Inc. and its subsidiary, Lasen ALPIS, LLC (collectively, "Lasen"), arising out of their lawsuit against him for breach of contract, breach of the duty of good faith and fair dealing, misappropriation of trade secrets, and for injunctive relief. After a bench trial, the district court found that Tadjikov had not misappropriated Lasen's trade secrets, but that he had breached his employment agreement with, and his fiduciary duty to Lasen by wrongfully retaining intellectual property and trade secrets that belonged to Lasen (consisting of software source codes and related materials that Lasen used to operate its equipment), and also found that injunctive relief was proper. The district court entered a judgment awarding damages and a permanent injunction requiring Tadjikov to return any Lasen materials in his possession and preventing him from using or disclosing to others any of Lasen's trade secrets or confidential information.

{2}    On appeal, Tadjikov raises numerous claims, including legal challenges to the breach of fiduciary duty and breach of contract claims, challenges to the district court's findings of fact, and factual and legal challenges to the award of damages.

He also claims that the grant of permanent injunctive relief was improper. Finally, he claims that Lasen is not entitled to attorney's fees.

{3}     We reverse the district court's entry of a permanent injunction against Tadjikov to the extent that it prevents him from disseminating Lasen's confidential information, because his employment contract only prohibited him from doing so for a five-year period that expired in April 2014. We affirm the rest of the permanent injunction. We affirm the remainder of the judgment due to Tadjikov's wholesale failure to establish that he preserved his claims for appeal.

**BACKGROUND**

{4}     Lasen is engaged in the business of detecting methane gas leaks in natural gas pipelines, which it does using a well-known technology called "light detection and ranging" or "laser imaging detection and ranging" (LIDAR). Lasen asserts that its business is unique because it is able to mount the LIDAR equipment onto a helicopter, and, thanks to its own proprietary technology, it can inspect pipelines more quickly and accurately than its competitors.

{5}     Lasen employed Tadjikov in 2004 as a research scientist. Tadjikov signed an employment agreement with Lasen, in which he agreed that "he [would] not, both during the term of his employment with [Lasen] and afterwards for a period of five (5) years from the date of termination disclose . . . [Lasen's] confidential or proprietary information to anyone." The agreement also stated that "[a]ny

2

intellectual property right that might accrue to . . . Tadjikov during his employment with [Lasen], or which he might thereafter have a right to due to ideas developed or explored while he was so employed, are hereby assigned to [Lasen]. . . . Tadjikov agrees that he will sign such documents as may be necessary to transfer such rights." During the course of his employment, Tadjikov became a minority shareholder in Lasen.

{6}     Though the parties disagree about whether Tadjikov's position officially included software engineering as part of his job, it is undisputed that Tadjikov wrote the source code needed to update and repair the three devices that Lasen uses to conduct its business (known as LIDAR 4, LIDAR 5 and LIDAR 6). Source code is defined as "[t]he non-machine language used by a computer programmer to create a program." *Black's Law Dictionary* 1610 (10th ed. 2014). It can be edited by a computer programmer. Tadjikov never received any formal training as a computer programmer, but taught himself how to code in the Delphi programming language, a language intended to be easy to use, but which is now essentially obsolete.

{7}     Once a programmer completes the source code for a program, the programmer will use two software components that work together, a "compiler" and one or more "libraries," to convert the source code into an "executable file" or "object code." The resulting executable file is expressed in binary code comprised

3

entirely of ones and zeroes, which a computer then uses to run the program. Programmers generally cannot read or edit an executable file. Compilers and libraries are available from third-party vendors under a variety of licensing agreements. It is virtually impossible to "decompile" an executable file and turn it back into source code. Lasen therefore needed the source code to update or modify the LIDAR units.

{8}     The parties' dispute stems from Lasen's termination of Tadjikov's employment in April 2009. Lasen sued Tadjikov fifteen months later, alleging that he violated the New Mexico Uniform Trade Secrets Act (the Act), NMSA 1978, §§ 57-3A-1 through -7 (1989), and that he breached his employment agreement, his duty of good faith and fair dealing to Lasen, and his fiduciary duty to Lasen by misappropriating the source codes he wrote for LIDARs 4, 5 and 6.

{9}     According to Lasen, Tadjikov returned to Lasen's office the day after his termination to retrieve his personal items. But Tadjikov instead took property and information that belonged to Lasen, including the source code that he had written for LIDARs 4, 5 and 6, and he failed to provide Lasen with a complete copy of the source code. Lasen presented evidence that during his employment, Tadjikov wrote the source code on his personal hard drive, but did not allow other employees or shareholders access to it. After his termination, Tadjikov refused to give Lasen the portable hard drive on which he wrote the source code, and that as

4

he was leaving, he told shareholders and employees of Lasen that it would cost half a million dollars to get rid of him. Lasen presented evidence that Tadjikov deleted portions of the source code in Lasen's possession, and that he failed to leave any sort of documentation to allow subsequent software engineers to understand and modify his source code, making it impossible for Lasen to upgrade and update the LIDARs. Lasen also presented testimony that Tadjikov tied the source code to specific serial numbers in the hardware of the LIDARs, making it impossible to transfer the programs to another hard drive, or to replace the equipment within the LIDARs without updating the source code, but did not tell anyone else he had done that. Moreover, Lasen offered proof that when Tadjikov returned two lab books that he used to document his work with the company, they were missing at least 70-80 pages of information.

{10}  Lasen's witnesses testified that Tadjikov failed to leave the libraries and compilers necessary to successfully run the source code, nor did Tadjikov indicate through documentation which libraries were needed to run the source code. Lasen also contended that Tadjikov attempted to use its trade secrets when seeking employment with a company that was in discussions to buy Lasen. Tadjikov offered to build a methane gas leak detection system for that company, and Lasen alleged that Tadjikov had suggested to the company that it could hire him to build a new system rather than purchase Lasen. Additionally, Lasen provided evidence

that Tadjikov had withheld source code from previous employers, relying on the testimony of Dr. Gary Eiceman, a professor at New Mexico State University who used to supervise Tadjikov, that when Tadjikov left Dr. Eiceman's laboratory, he refused to provide him with source code he had developed for the laboratory, arguing that it was his property.

{11} Tadjikov denied these accusations. He testified that he provided a CD containing a copy of the source code to his direct supervisor, Dr. Egor Degtiarev, and to the former CEO of Lasen, Inc., Bob Reich. He further testified that he had placed copies of the source code directly onto the LIDAR units until he was instructed by Mr. Reich to delete it from the units for security purposes. Tadjikov contended that he used his own personal academic version of the libraries and compilers to create a prototype of the software, which he obtained during his time as an assistant professor at New Mexico State University, and that he had provided a copy of the libraries and compliers to Lasen. Tadjikov argued that Lasen failed to purchase a commercial license for the libraries and compliers, and was operating the LIDAR units illegally due to the lack of proper software licensing.

{12} Litigation on the case continued for several years, and by the time of trial, the parties had stipulated that the source codes were trade secrets, and that they belonged to Lasen. The parties also stipulated that no single CD could possibly contain the entirety of the source codes, libraries, and compilers because of the

limited storage capacity of CDs at the time. After a four-day bench trial, the district court issued findings of fact and conclusions of law in which it generally accepted Lasen's version of the facts. It concluded that Tadjikov had breached both his employment agreement with, and his fiduciary duty to, Lasen, by wrongfully retaining Lasen's source code, and that he did so with the intent to use the source codes for his own financial gain or for some other improper motive, such as retaliating against Lasen for terminating him. The district court, however, found that Tadjikov had not committed any actual misappropriation of trade secrets under the Act because he did not actually disclose them to a third party or put them to commercial use. As a result of Tadjikov's wrongful retention of the source code, the district court concluded that the following damages were appropriate: $170,000 for the 3,293 hours expended by Lasen to repair the LIDAR units as a result of not having the source codes; $395,000 for the value of LIDAR 6, which had to be decommissioned, minus its salvage value; disgorgement of one year of Tadjikov's salary ($72,000) for breach of the employment agreement and breach of fiduciary duty; and $100,000 in punitive damages. The district court reserved its decision about whether Lasen was entitled to attorney's fees to a later date.

{13}     The district court later entered judgment against Tadjikov in accord with its findings and conclusions on Lasen's damages claims, and also entered judgment that Lasen was entitled to recover attorney's fees, while reserving the amount of

those fees to a future hearing. The record on appeal, however, does not contain any order actually awarding attorney's fees to Lasen. The district court entered a permanent injunction prohibiting Tadjikov from disseminating, misappropriating, or retaining any trade secret of Lasen, and ordered Tadjikov to return any source code for LIDARs 4, 5, and 6 that Tadjikov has, or ever finds or creates. Tadjikov now appeals.

**DISCUSSION**

**I.  Tadjikov has failed to demonstrate that he preserved the majority of his claims, and we therefore decline to review them**

{14} Tadjikov's brief in chief raises numerous, complex, and sometimes novel claims, arguing that the district court erred: (1) by finding that he breached a fiduciary duty as either an employee or a shareholder, where he owed no such duty since he was a minority shareholder in Lasen, did not occupy any position of managerial authority, and did not benefit from the source codes that he wrongfully retained; (2) by imposing on Tadjikov an obligation to provide Lasen with a copy of the source codes and related materials, thereby improperly rewriting Tadjikov's at-will employment contract with Lasen to add terms that the parties never bargained for; (3) by awarding consequential damages that were unsupported by any evidence that the parties contemplated those damages at the time of contracting; (4) by entering self-contradictory findings of fact and conclusions of law that do not support the judgment; (5) by awarding damages against Tadjikov

that are barred by the economic loss doctrine; (6) by awarding damages that amount to a double recovery in some instances; (7) by awarding damages that are arbitrary, based on an improper measure of damages, or unsupported by substantial evidence; (8) by ordering Tadjikov to disgorge an amount equal to one year of his salary at Lasen, although the award was unsupported by evidence that he derived any financial benefit from his retention of Lasen's source code; and (9) by entering judgment in favor of Lasen on its claim for attorney's fees, because the employment agreement did not provide for them, and because Lasen was not entitled to fees under the Act.

{15}     Tadjikov must show that he preserved these claims for appellate review before we will address them. *See* Rule 12-321(A) NMRA. "To preserve an issue for review on appeal, it must appear that [the] appellant fairly invoked a ruling of the [district] court on the same grounds argued in the appellate court." *Benz v. Town Ctr. Land, LLC*, 2013-NMCA-111, ¶ 24, 314 P.3d 688 (internal quotation marks and citation omitted). "The primary purposes for the preservation rule are: (1) to specifically alert the district court to a claim of error so that any mistake can be corrected at that time, (2) to allow the opposing party a fair opportunity to respond to the claim of error and to show why the [district] court should rule against that claim, and (3) to create a record sufficient to allow this Court to make

9

an informed decision regarding the contested issue." *Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 56, 146 N.M. 853, 215 P.3d 791.

**{16}** An important provision of the Rules of Appellate Procedure helps this Court to determine whether an appellant's claims have been preserved. Rule 12-318(A)(4) NMRA requires an appellant's brief in chief to include, with respect to each claim raised on appeal, "a statement explaining how the issue was preserved in the court below, with citations to authorities, record proper, transcript of proceedings, or exhibits relied on." Preservation statements help New Mexico's appellate courts to more efficiently and effectively perform their function, not only to determine whether a particular claim has been preserved, but also to understand the context in which the claim arose and the reasoning underlying the district court's decision. And, in a time of scarce judicial resources and a heavy docket, preservation statements help our appellate courts to work more efficiently. The importance of adequate preservation statements is underscored by our Supreme Court's declaration that an appellant's failure to include an adequate one may, by itself, justify an appellate court in declining to review a claim. *See Glaser v. LeBus*, 2012-NMSC-012, ¶ 13, 276 P.3d 959 (stating that where a party fails to comply with requirement to demonstrate where a claim was preserved, an appellate court may decline to review that claim).

**{17}** Tadjikov's brief in chief includes several nearly-identical preservation statements that purport to describe how his claims were preserved. These cite Tadjikov's statement of the case in the pre-trial order, his proposed findings of fact and conclusions of law, and a post-trial brief as evidence that he preserved his claims. Given the novelty and complexity of his claims, we were interested in how they had developed and what the district court had said about them. But when we reviewed the documents that Tadjikov cited, we could find no reference to any claim or argument remotely similar to the ones that he raises now. Tadjikov's statement of the case in the pretrial order did state generally that Lasen's entitlement to damages was an issue to be determined at trial, and in his post-trial proposed findings of fact and conclusions of law, he asserted that Lasen was not entitled to damages because he did not misappropriate any trade secrets or breach any of his duties to Lasen, but these general statements were woefully insufficient to preserve the detailed and specific attacks on the damages awards that he now raises in this appeal. *See Crutchfield v. N.M. Dep't of Taxation and Revenue*, 2005-NMCA-022, ¶ 14, 137 N.M. 26, 106 P.3d 1273 ("[O]n appeal, the party must specifically point out where, in the record, the party invoked the court's ruling on the issue. Absent that citation to the record or any obvious preservation, we will not consider the issue.").

11

**{18}** Tadjikov's preservation statements also assert that he raised his claims "in arguments to the [d]istrict [c]ourt, and testimony and evidence elicited" during two pre-trial hearings, and during the four-day bench trial. Although Rule 12-318(A)(4) required the preservation statements to include "citations to . . . [the] record proper, transcript of proceedings, or exhibits relied on[,]" Tadjikov has failed to cite the pages of these transcripts where he preserved his claims. By failing to include specific citations, Tadjikov invites this Court to review hundreds of pages of argument and testimony (the four-day trial transcript alone is 939 pages long) to figure out whether his claims were preserved. We may decline to review Tadjikov's claims on this ground alone. *See In re Norwest Bank of N.M., N.A.*, 2003-NMCA-128, ¶ 30, 134 N.M. 516, 80 P.3d 98 (stating that this Court will not search transcripts for evidence of preservation where the appellant refers generally to the transcripts, but fails to provide specific page numbers). Nevertheless, although not obligated to do so, we have reviewed these transcripts, and cannot find any reference to the claims that Tadjikov now presses on appeal.

**{19}** We conclude that Tadjikov's brief in chief has failed to establish that he preserved the above-listed claims, as required by Rule 12-318(A)(4), and we therefore decline to review them. We rely on this rule although Lasen did not point out Tadjikov's failure to follow it, much less his actual failure to preserve his

12

claims, because failure to comply with the Rule has obstructed our ability to conduct appropriate appellate review.

## II.    Tadjikov's challenges to the permanent injunction

{20}    Tadjikov objects to the district court's entry of a permanent injunction against him on three grounds. First, he argues that the evidence was insufficient to demonstrate a "threatened misappropriation" of trade secrets, as required to support an injunction under the Act. Second, he argues that the injunction is improper because it is unlimited in time; that is, the injunction permanently precludes him from ever disclosing Lasen's trade secrets or confidential information even though the parties' employment contract only imposed a five-year post-termination period of confidentiality on Tadjikov. Finally, Tadjikov argues that injunctive relief was improper because Lasen had an adequate remedy at law. The first claim lacks merit and Tadjikov has failed to demonstrate how he preserved the third claim, but we conclude that the second claim is meritorious to the extent that it imposes an obligation of confidentiality on Tadjikov that is unlimited in time.

{21}    "[I]njunctions are harsh and drastic remedies which should issue only in extreme cases of pressing necessity and only where there is [a showing of irreparable injury for which there is] no adequate and complete remedy at law." *Luginbuhl v. City of Gallup*, 2013-NMCA-053, ¶ 31, 302 P.3d 751 (internal

quotation marks and citation omitted). We review a district court's decision to issue a permanent injunction for an abuse of discretion. *See Insure N.M., LLC v. McGonigle*, 2000-NMCA-018, ¶ 7, 128 N.M. 611, 995 P.2d 1053 ("The granting of an injunction is an equitable remedy, and whether to grant equitable relief lies within the sound discretion of the trial court."). "[T]he trial court abuses discretion when it applies an incorrect standard, incorrect substantive law, or its discretionary decision is premised on a misapprehension of the law." *Aragon v. Brown*, 2003-NMCA-126, ¶ 9, 134 N.M. 459, 78 P.3d 913. To the extent that this case requires us to interpret the Act, statutory interpretation is a question of law which we review de novo. *State ex rel. Children, Youth & Families Dep't. v. Maurice H.*, 2014-NMSC-034, ¶ 65, 335 P.3d 746.

**A.     Lasen proved the existence of "threatened appropriation" sufficient to support an injunction against Tadjikov**

{22}     The Act provides that "[a]ctual or threatened misappropriation [of a trade secret] may be enjoined." NMSA 1978, § 57-3A-3(A) (1989). Tadjikov argues that the permanent injunction was improper. First, he argues that the injunction is not based on any actual misappropriation of a trade secret because the district court rejected Lasen's misappropriation claim. Second, Tadjikov argues that evidence was insufficient to support the district court's finding that threatened misappropriation existed, because he never made any threat to disclose Lasen's trade secrets to a third party.

14

{23}    We agree with Tadjikov that the permanent injunction is not based on any actual misappropriation of a trade secret. The district court found that Tadjikov "did not misappropriate Lasen's trade secrets in that he did not receive some sort of unfair trade advantage, nor did he disclose them to a third person or otherwise place the information to commercial use," and concluded that "[t]he evidence at trial did not place Lasen's misappropriation claims within the coverage of the . . . Act." But the district court also found that "the evidence is sufficient to require a need for continued injunctive relief under Section 57-3A-3." Lasen does not appear to dispute Tadjikov's argument that the injunction does not rest on any actual misappropriation under the Act.

{24}    Accordingly, we turn to consider whether sufficient evidence of "threatened misappropriation" existed to support entry of the injunction. Tadjikov, quoting *Black's Law Dictionary* 1030 (6th ed. 1991), argues that the word "threat" should be defined as "[a] communicated intent to inflict physical or other harm on any person or property." And because Lasen offered no evidence that he ever communicated any such threat, Tadjikov argues that there was no "threatened misappropriation" under the Act. Lasen does not respond to Tadjikov's interpretation of the Act.

{25}    Despite Lasen's failure to help us on this point, we conclude that Tadjikov's interpretation of "threatened misappropriation" is too narrow. First, the plain

meaning of the word "threat" is broader than Tadjikov admits. To be sure, the term includes the communication of an explicit intent to harm, but it is also defined as "[a]n indication of approaching menace; the suggestion of an impending detriment," and as "[a] person or thing that might well cause harm." *Black's Law Dictionary* 1708-09 (10th ed. 2014). Second, other courts have not limited the term to situations in which a defendant explicitly threatens to disclose trade secrets to others. Thus, for example, under California law, "[t]hreatened misappropriation may be demonstrated by showing either that the defendant possesses trade secrets and has misused or disclosed those secrets in the past, that the defendant intends to misuse or disclose those secrets, or that the defendant possesses trade secrets and wrongfully refuses to return them after a demand for return is made." *Clorox Co. v. S.C. Johnson & Son, Inc.*, 627 F. Supp. 2d 954, 968-69 (E.D. Wis. 2009). Without attempting to set forth a comprehensive definition of "threatened misappropriation," we agree that it occurs when a defendant possesses trade secrets and wrongfully refuses to return them to the owner. This makes sense, because where a defendant has trade secrets and wrongfully refuses to return them to their owner, it is reasonable to infer that the defendant may intend to use them in a way that harms the owner, and reasonable to protect the trade secret owner against that risk.

16

{26}    Here there was ample evidence that Tadjikov possessed Lasen's trade secrets and wrongfully refused to return them after Lasen demanded their return. The district court found that Tadjikov "wrongfully failed to provide Lasen with the programming environment in which he created the source code;" that he "took possession of source codes, lab books and trade secrets of Lasen in defiance of the Lasen's rights with intent to deprive and negate Lasen of its lawful property, and further wrongfully retained such property following multiple demands for their return[;]" and "engaged in this conduct so as to ensure Lasen would be without copies of the source code so as to impair and impede Lasen's ability to repair, modify or improve the LIDAR units which [Tadjikov] had developed and upon which Lasen commercially relied on." Tadjikov does not challenge these findings of fact, and accordingly we deem them conclusive. *See* Rule 12-318(A)(4) (stating that the argument in an appellant's brief in chief "shall set forth a specific attack on any finding, or the finding shall be deemed conclusive"). We therefore hold that the evidence was sufficient to support the district court's conclusion that Tadjikov's "threatened misappropriation" of Lasen's trade secrets supported a grant of injunctive relief under the Act.

**B.    The injunction is improperly unlimited in time**

{27}    Tadjikov next argues that the permanent injunction violates the Act because it imposes obligations on him to protect Lasen's trade secrets that are unlimited in

17

time, even though the parties themselves agreed that a five-year period post-termination was appropriate. We agree with Tadjikov that the injunction should not have extended his obligation not to disclose Lasen's trade secrets and confidential information beyond the time that Lasen itself agreed was proper.

{28}     The Act places a temporal limit on injunctive relief by stating that "[u]pon application to the court, an injunction shall be terminated when the trade secret has ceased to exist but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation." Section 57-3A-3(A). Here, Tadjikov's employment agreement states that "[Tadjikov] will not, both during the term of his employment with Lasen and afterwards for a period of five (5) years from the date of termination disclose [Lasen's] confidential or proprietary information to anyone. Confidential and proprietary information includes any information that is not generally known and which is, or which may be, useful in the operation of [Lasen] or which may be beneficial to anyone in competition with Lasen. Such information includes, but is not limited to, information concerning projects being worked on or contemplated by Lasen, technical information, and information concerning the commercialization of Lasen's products and Lasen's financial affairs." This obligation included Lasen's trade secrets, which by definition are not generally known. *See* § 57-3A-2(D)(1) (defining "trade secret" as "information . . . that: (1)

18

derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use[.]").

{29} Accordingly, because Lasen terminated Tadjikov's employment in April 2009, his contractual obligation not to disclose Lasen's trade secrets or confidential information only extended through April 2014. The district court's injunction, however, was entered in April 2015 and imposed a non-disclosure obligation on Tadjikov without any temporal limit. While Section 57-3A-3(A) allows an injunction to continue "for an additional reasonable period of time in order to eliminate commercial advantage" even after a trade secret no longer exists, Lasen itself agreed, in its employment agreement with Tadjikov, that a post-termination period of five years was reasonable. In its answer brief, Lasen does not respond to Tadjikov's argument that the injunction's unlimited time period is improper, much less offer any attempt to justify it. Moreover, the district court acknowledged at the hearing on the motion for reconsideration that the technology at issue "was already obsolete or becoming obsolete. So in essence, it's really an injunction on obsolete technology or equipment." We therefore conclude that it was improper for the district court to issue an injunction that protected Lasen's trade secrets from disclosure beyond the five years that Lasen contracted for. *See In re N.M. Indirect Purchasers Microsoft Corp.*, 2007-NMCA-007, ¶ 41, 140 N.M. 879, 149 P.3d 976

19

("We will not rewrite a contract to create an agreement for the benefit of one of the parties that, in hindsight, would have been wiser." (alteration, internal quotation marks, and citation omitted)).

{30}     We do, however, affirm the district court's injunction to the extent that it requires Tadjikov to turn over to Lasen any copies of the source code in his possession, or which he "may ever discover or create," including "any reasonable facsimile of such source code[.]" The parties agreed that the source code was Lasen's property. The district court found that Tadjikov wrongfully retained "the intellectual property rights and trade secrets which he had created and assigned to Lasen in accordance with their employment agreement." The district court further found that his retention of the source code made it difficult for Lasen to modify or repair the LIDAR units on which its business relies. Tadjikov does not challenge these factual findings on appeal. We conclude that even if the source code no longer constituted a trade secret, and although Tadjikov no longer has an obligation to keep it confidential, it is still Lasen's property, and Lasen is entitled to its return. Accordingly, we hold that it was reasonable for the district court to order Tadjikov to return to Lasen any source code in his possession or that he might obtain possession of in the future.

{31}     We reverse the district court's order issuing a permanent injunction against Tadjikov only to the extent it prevents him from disseminating source code to third

20

parties in the future. The portion of the injunction as it relates to Tadjikov's wrongful retention of the source code is affirmed.

**C. We decline to address Tadjikov's argument that the injunction was improper because Lasen had an adequate remedy at law**

**{32}** Tadjikov argues that the permanent injunction was improper because Lasen had an adequate remedy at law. As discussed above, we have reviewed the documents and transcripts that Tadjikov cited in his preservation statements contained in his brief in chief. We can find no reference to any argument that the permanent injunction should not have been granted because Lasen had an adequate remedy at law. Accordingly, we decline to review this claim due to Tadjikov's failure to demonstrate how and when it was preserved, as required by Rule 12-318(A)(4).

21

### III. Lasen's request for appellate attorney's fees is unsupported

**{33}** In the concluding paragraph of its answer brief, Lasen asks this Court to award it attorney's fees for this appeal. Rule 12-403(B)(3) NMRA allows this Court to award "reasonable attorney fees for services rendered on appeal in causes where the award of attorney fees is permitted by law." Lasen, however, does not identify the legal basis on which it asks for attorney's fees, and therefore we conclude that this request lacks merit.

### CONCLUSION

**{34}** We reverse the district court's imposition of a permanent injunction against Tadjikov to the extent that it requires him to maintain the confidentiality of Lasen's trade secrets in perpetuity. We affirm the judgment and permanent injunction in all other respects. Lasen's request for appellate attorney's fees is denied.

**{35}** **IT IS SO ORDERED.**

_____
**EMIL J. KIEHNE, Judge**

**WE CONCUR:**

_____
**JULIE J. VARGAS, Judge**

_____
**DANIEL J. GALLEGOS, Judge**

22