# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2024-NMCA-084**

**Filing Date: September 23, 2024**

**No. A-1-CA-39966**

**SUSAN L. SIEBERT,**

Plaintiff-Appellee,

v.

**REBECCA C. OKUN, M.D. and
WOMEN'S SPECIALISTS OF
NEW MEXICO, LTD.,**

Defendants-Appellants.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Victor S. Lopez, District Court Judge**

Curtis & Co.
Lisa K. Curtis
Luke W. Holmen
Albuquerque, NM

for Appellee

Hinkle Shanor LLP
William P. Slattery
Dana S. Hardy
Benjamin L. Lammons
Santa Fe, NM

Lorenz Law
Alice T. Lorenz
Albuquerque, NM

for Appellants

Integration Group, Inc.
Barry J. Berenberg, Senior Counsel
Albuquerque, NM

Office of Superintendent of Insurance

Cass Brulotte, Life & Health Attorney
Albuquerque, NM

for Amicus Curiae

**OPINION**

**IVES, Judge.**

**{1}**    The Medical Malpractice Act (MMA), NMSA 1978, §§ 41-5-1 to -29 (1976, as amended through 2023), imposes caps on liability, one of which limits "a health care provider's personal liability" for "monetary damages and medical care and related benefits." Section 41-5-6(D) (1992).[1] When, under a judgment or settlement, a plaintiff is owed an amount "in excess of" the amount of the provider cap, the excess "shall be paid from the patient's compensation fund" (PCF). *Id.* This appeal, which is the second to this Court in this litigation, presents two questions of first impression about the recovery of pre- and post-judgment interest when a plaintiff is owed more than the statutorily capped amount for provider liability. First, are pre- and post-judgment interest recoverable on the capped amount plus the excess or only on the capped amount? We hold that interest is recoverable on the total of the capped amount and the excess. That holding raises a second question: Must the liable provider pay only the interest on the capped amount, or must the provider also pay the interest on the excess, even though the PCF is liable for amounts over the statutory cap? We hold that interest must be allocated between the provider and the PCF in accordance with the allocation of their liability for damages under the MMA. In other words, the provider must pay the interest on the capped amount, and the PCF must pay the interest on the amount "in excess of" the cap. Section 41-5-6(D). In reaching this holding, we conclude that the PCF does not have sovereign immunity from the payment of interest under NMSA 1978, Section 56-8-4(D) (2004) because the PCF is not "the state."

**{2}**    In this case, the district court answered the first question correctly: It awarded Plaintiff Susan L. Siebert pre- and post-judgment interest on the capped amount as well as the excess owed to her under the judgment. However, the district court answered the second question incorrectly: It held the providers, Defendants Rebecca Okun, M.D. and Women's Specialists of New Mexico, liable for all of the interest. We therefore affirm as to the amount of interest, but reverse as to the allocation of liability for interest, and remand for amendment of the judgment consistent with this opinion. We also reject Defendants' argument that the district court erred in determining when interest stopped accruing.

---

[1]Various sections of the MMA were amended after the district court entered judgment in this case. Among other amendments, the cap on an individual health care provider's personal liability increased from $200,000, *see* § 41-5-6(D) (1992), to $250,000, *see* § 41-5-6(I) (2023). Throughout this opinion we refer to the version of the MMA that was in effect at the time of the judgment, unless we indicate otherwise.

**BACKGROUND**

**{3}**     Plaintiff sued Defendants for medical malpractice in 2013. The jury found that Defendant Dr. Okun was negligent and awarded Plaintiff $2.6 million in compensatory damages—an amount above the statutory cap on nonmedical and nonpunitive damages imposed by the MMA. The MMA limited Plaintiff's total damages recovery to $1,535,916.15. This total is the sum of $935,916.15 in stipulated medical expenses, which are not subject to any cap, plus nonmedical damages, which are capped by the MMA at $600,000. *See* § 41-5-6(A).[2] Despite this statutory cap, the district court entered the $2.6 million judgment against Defendants in April 2016, with interest and costs to be determined at a later date. Plaintiff moved for pre- and post-judgment interest. But Defendants objected to the judgment, moving to amend it from $2.6 million to $1,535,916.15 to reflect the $600,000 cap, $200,000 of which would be paid by Defendants pursuant to the cap on provider liability in Section 41-5-6(D). After a sua sponte evidentiary hearing on Defendants' motion, the district court denied Defendants' motion and ruled that the MMA's statutory cap is unconstitutional.

**{4}**     Defendants' appeal challenging this ruling was the first appeal in this litigation. This Court certified the constitutional questions to our Supreme Court, *see* Rule 12-606 NMRA, which accepted certification, held that the $600,000 cap on aggregate nonmedical and nonpunitive damages is constitutional, and reversed the district court and remanded for proceedings consistent with its opinion. *See Siebert v. Okun*, 2021-NMSC-016, ¶¶ 1-3, 56, 485 P.3d 1265.

**{5}**     On remand, Plaintiff submitted a proposed order conforming the judgment to the $600,000 cap and calculating pre- and post-judgment interest on $1,535,916.35,[3] instead of $2.6 million. The proposed form of order held Defendants exclusively liable for all of the interest on the entire judgment. Defendants objected, arguing that they are only personally liable for $200,000 plus the interest on that amount, and that "[t]he judgment should reflect the statutory allocation of liability as between Defendants and the [PCF]." The district court did not accept this argument. Instead, the court adopted Plaintiff's proposed order and calculated interest based on $1,535,916.35, awarding $411,120 in pre-judgment interest and $166,005.27 in post-judgment interest against Defendants. A dispute also arose about when post-judgment interest stopped accruing, and the district court resolved that dispute in favor of Plaintiff.

**{6}**     Defendants appealed. After briefing by the parties was complete and the parties participated in oral argument, we invited the Superintendent of Insurance (SOI), as

---

[2]Punitive damages are also not subject to the $600,000 cap, *see* § 41-5-6(A), but no punitive damages were awarded in this case.
[3]Despite Defendants' motion to amend the judgment to $1,535,916.15 based on stipulated medical and related benefits of $935,916.15, Plaintiff's proposed order on remand asked for interest on $1,535,916.35—twenty cents more than the stipulated amount. This amount was ultimately adopted by the district court in its order conforming the judgment to the MMA, and we therefore refer to this amount throughout the opinion.

custodian of the PCF, *see* § 41-5-25(C) (2021), to submit a brief as amicus curiae. The SOI did so, and the parties responded with supplemental briefs.

## DISCUSSION

### I.      Awards of Interest on Judgments Under the MMA

**{7}**      Defendants' appeal presents two legal issues regarding the availability of interest on judgments under the MMA. The first issue we address is whether Plaintiff is entitled to interest on the full amount of the judgment—the entire $1,535,916.35 recoverable consistent with the $600,000 cap on nonmedical damages—or only on the amount recoverable against Defendants pursuant to the $200,000 cap on the personal liability of providers. *See* § 41-5-6(D). We hold that Plaintiff may recover interest on the full amount. We then turn to the second question of who is liable for the interest on the amount above the personal liability cap, holding that liability for interest is allocated between Defendants and the PCF in accordance with the MMA's allocation of liability for damages.

### A.      Plaintiffs Are Entitled to Interest on $1,535,916.35

**{8}**      Plaintiff argues that pre- and post-judgment interest under Section 56-8-4 should be calculated based on the entire judgment and not on the capped amount for which a provider is personally liable under the MMA, and therefore the district court did not err in awarding her pre- and post-judgment interest on $1,535,916.35.[4] We agree.

**{9}**      The interpretation of the MMA and the interest statute "presents a question of law that we review de novo." *Tucson Elec. Power Co. v. N.M. Tax'n & Revenue Dep't*, 2020-NMCA-011, ¶ 6, 456 P.3d 1085. In order to give effect to the Legislature's intent, we look first to the plain language of the statutes. *See Stennis v. City of Santa Fe*, 2010-NMCA-108, ¶ 10, 149 N.M. 92, 244 P.3d 787 ("Our courts have repeatedly observed that a statute's plain language is the most reliable indicator of legislative intent."). When the plain language "is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *Sims v. Sims*, 1996-NMSC-078, ¶ 17, 122 N.M. 618, 930 P.2d 153 (text only) (citation omitted). Because multiple statutes are at play here, we seek to interpret them in a harmonious way. *See Draper v. Mountain States Mut. Cas. Co.*, 1994-NMSC-002, ¶ 4, 116 N.M. 775, 867 P.2d 1157.

---

4The district court awarded litigation costs to Plaintiff as well as interest on those costs. Defendants do not argue that the district court's award of costs against Defendants runs afoul of the statutory cap on personal liability. Nor do they argue that the district court erred by requiring them to pay interest on costs. However, the calculation of interest proposed by Defendants in their brief in chief omits interest on costs. It is unclear to us whether this omission was inadvertent or intentional. In any event, absent any argument challenging the award of interest on costs, we have no basis for questioning, much less undoing, that aspect of the judgment. *See State ex rel. Hum. Servs. Dep't v. Staples* (hereinafter *In re Doe*), 1982-NMSC-099, ¶¶ 3, 5, 98 N.M. 540, 650 P.2d 824 (stating an appellate court should not reach issues that the parties have failed to raise in their briefs).

**{10}** In this case, harmony occurs naturally because the statutes include nothing discordant on the question presented; interest is available under the interest statute and under the MMA. The interest statute, Section 56-8-4, applies generally to awards of interest on judgments and decrees, and the statutory text neither excludes medical malpractice judgments nor imposes limitations on awards of interest under the MMA. Section 56-8-4(A) provides for post-judgment interest, stating that "[i]nterest shall be allowed on judgments and decrees for the payment of money from entry" and shall be calculated "at the rate of fifteen percent" when the judgment is for "tortious conduct." That is, the text of the statute makes post-judgment interest broadly available on judgments and decrees, and explicitly provides for a higher rate of interest in tort cases, *see Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶¶ 73-79, 146 N.M. 853, 215 P.3d 791, of which medical malpractice cases are one type. Section 56-8-4(B) allows for pre-judgment interest "of up to ten percent," at the discretion of the district court, "after considering, among other things: (1) if the plaintiff was the cause of unreasonable delay in the adjudication of the plaintiff's claims; and (2) if the defendant had previously made a reasonable and timely offer of settlement to the plaintiff." The statute includes just one exception: Pre-judgment interest may not be awarded "on unpaid child support." *Id.* In contrast, the Legislature did not create an exception disallowing either pre- or post-judgment interest for medical malpractice judgments. Nor did the Legislature indicate that a special method of calculating interest should be used in medical malpractice cases. We will not read any such language into the statute. *See Bell v. N.M. Interstate Stream Comm'n*, 1993-NMCA-164, ¶ 12, 117 N.M. 71, 868 P.2d 1296.

**{11}** The availability of pre- and post-judgment interest on medical malpractice judgments as one type of tort judgment, pursuant to Section 56-8-4, is in harmony with the MMA because nothing in the plain language of the MMA disallows awards of interest or requires interest to be calculated in a different fashion. Although Section 41-5-6(D) caps "[a] health care provider's personal liability," the cap applies only to "monetary damages and medical care and related benefits as provided in" Section 41-5-7. Neither Section 41-5-6 nor Section 41-5-7 says, or in any way suggests, that interest is disallowed or that a lower interest rate applies. Had the Legislature wished to impose limits on personal liability beyond the damages cap by disallowing or limiting interest on medical malpractice judgments under the MMA, the Legislature would have done so, *see State v. Greenwood*, 2012-NMCA-017, ¶ 38, 271 P.3d 753, just as it did in the New Mexico Tort Claims Act with respect to pre-judgment interest. *See* NMSA 1978, § 41-4-19(A), (D) (2007) (capping damages and stating that "[n]o judgment against a governmental entity or public employee for any tort which immunity has been waived under the Tort Claims Act shall include an award for exemplary or punitive damages *or for interest prior to judgment*" (emphasis added)).

**{12}** Because the plain language of Section 56-8-4 and the plain language of the MMA clearly allow recovery of pre- and post-judgment interest on medical malpractice judgments, we need not resort to other canons of statutory construction. *See Sims*, 1996-NMSC-078, ¶ 17. We therefore hold that the district court did not err by awarding

pre- and post-judgment interest based on the entire judgment of $1,535,916.35. We now turn to the question of who is liable for the interest.

**B.     Interest on Amounts in Excess of the Statutory Cap Must Be Paid by the PCF Rather Than Defendants**

{13}     Plaintiff contends that the district court correctly required Defendants to pay interest on the entire amount of the judgment. Defendants argue that the district court erred because "[p]re[-]judgment and post[-]judgment interest can be awarded against Defendants based only on their $200,000 personal liability, not the remaining portion of the capped judgment for which only the [PCF] is liable." Therefore, according to Defendants, "to the extent that [Plaintiff] can recover . . . interest for the amounts above Defendants' personal liability, such amounts would have to be recovered from the PCF." Having determined that Plaintiff can recover interest on amounts in excess of the cap on Defendants' personal liability, we agree with Defendants that the district court erred by requiring them to pay interest on the entire amount of the judgment. We hold that the PCF must pay the interest on the amount of damages in excess of the provider liability cap because liability for interest must be allocated in accordance with the MMA's allocation of liability for damages.

{14}     The foundation for our holding is the commonsense principle—recognized in the common law—that a person is only liable for interest on that person's share of the underlying debt. *See Bruning v. United States*, 376 U.S. 358, 360 (1964) (holding that interest is "an integral part of a continuing debt" and petitioner was therefore "personally liable" for interest on his portion of the underlying debt); *Moon v. City of Baton Rouge*, 522 So.2d 117, 126-28 (La. Ct. App. 1987) (holding that interest was owed on each defendant's proportionate share of the judgment); *Celina Mut. Ins. Co. v. Citizens Ins. Co. of Am.*, 349 N.W.2d 547, 549-51 (Mich. Ct. App. 1984) (same). Because the MMA does not discuss interest at all, much less allocation of interest, we conclude that the Legislature did not intend to disturb the common law. *See Sims*, 1996-NMSC-078, ¶ 22 ("[S]tatutes will be read strictly so that no innovation upon the common law that is not clearly expressed by the [L]egislature will be presumed."). A straightforward application of the common law approach here requires Defendants to pay interest on the share of the judgment for which they are personally liable under the MMA, and requires the PCF to pay interest on the share of the judgment for which the PCF is liable—i.e., interest on the amount in excess of the cap on personal liability. *See* 41-5-6(D). In other words, liability for interest on medical malpractice judgments must be allocated consistent with the method of allocating liability for damages that our Legislature chose when it enacted the MMA.[5]

---

[5]Plaintiff argues that this allocation of liability for interest gives "no incentive for a negligent healthcare provider to settle a severe injury or death case in favor of the harmed plaintiff rather than take the chance of a defense verdict unless there are consequences for exercising unnecessary delay tactics." This is a policy argument about how best to calibrate incentives to settle in medical malpractice cases in which the personal liability cap applies. We are not the right audience for this argument because our job does not involve second guessing policy choices made by our Legislature. *See State v. Maestas*, 2007-NMSC-001, ¶ 14, 140 N.M. 836, 149 P.3d 933 ("Our role is to construe statutes as written and we should not

**{15}** The SOI does not dispute any of this but contends that it should not be required to pay the share allocated to it for two reasons. First, the SOI briefly argues that "the PCF cannot pay interest on judgments" because the Legislature did not specifically and explicitly give the PCF the authority to do so. The SOI asserts that the MMA only allows the PCF to pay "monetary damages and past medical expenses, Section 41-5-6(D)," "future medical expenses as they are incurred, Section 41-5-7([C])," and "the 'expenses of collecting, protecting and administering' the fund, as well as 'purchasing insurance for the fund[,]' Section 41-5-25([E])," but that no provision of the MMA mentions the PCF paying interest. We do not share the SOI's understanding of the cited statutory provisions; we do not view them as creating an exhaustive list of items payable by the PCF. Section 41-5-7(C) does not address what the PCF may pay, but rather states that "future medical care and related benefits" are not subject to the $600,000 damages cap in Section 41-5-6(A). And Section 41-5-25(F) merely lists certain administrative expenses that the PCF must pay. The key statute—the one describing the PCF's overarching liability—is Section 41-5-6(D). The part of Section 41-5-6(D) relied on by the PCF does not list items *payable by the PCF* but instead describes the categories of items that are *subject to the cap on a provider's liability*. The PCF's liability is addressed in the remainder of Section 41-5-6(D), which requires the PCF to pay "[*a*]*ny* amount due from a judgment or settlement in excess" of the capped amount. (Emphasis added.) "Any" is a broad word, and our Legislature did not narrow it by explicitly excluding interest or by imposing any other limitations that could support the conclusion that interest is excluded. For example, the Legislature did not state that the PCF is only responsible for damages in excess of the capped amount. We therefore conclude that the MMA provides for the payment of interest by the PCF.

**{16}** The SOI's second argument is that the PCF is exempt from the payment of interest under Section 56-8-4(D), which provides that "[t]he state and its political subdivisions are exempt from the provisions of [Section 56-8-4] except as otherwise provided by statute or common law." The Legislature did not define "the state and its political subdivisions" in the interest statute, and the MMA does not explicitly say whether or not the PCF should be considered "the state" or a "political subdivision" of the state.[6]

**{17}** This requires us to interpret Section 56-8-4(D) and, as always, we do so by first looking to the statute's plain language. *See Stennis*, 2010-NMCA-108, ¶ 10. Here, although the plain language alone does not directly and definitively answer the question, the words chosen by our Legislature help us to identify the purpose of the statute, and that purpose drives our interpretation. *See Pirtle v. Legis. Council Comm. of N.M.*

second guess the [L]egislature's policy decisions."); *Torres v. State*, 1995-NMSC-025, ¶ 10, 119 N.M. 609, 894 P.2d 386 ("[I]t is the particular domain of the [L]egislature, as the voice of the people, to make public policy.").

6Neither of the parties nor the SOI argue that the fund is a "political subdivision" of the state, which New Mexico law has defined as "a division of the parent entity for some governmental purpose," an entity "formed or maintained for the more effectual or convenient exercise of political power . . . to whom the electors residing therein are . . . granted power to locally self-govern." *Gibbany v. Ford*, 1924-NMSC-038, ¶ 7, 29 N.M. 621, 225 P. 577. We therefore address only whether the PCF is "the state." See In re Doe, 1982-NMSC-099, ¶¶ 3, 5.

*Legislature*, 2021-NMSC-026, ¶ 17, 492 P.3d 586 ("When called upon to interpret statutory provisions giving rise to genuine uncertainty as to what the Legislature was trying to accomplish, we look beyond the language to the purpose of the statute to ascertain legislative intent." (text only) (citation omitted)); *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 25, 117 N.M. 346, 871 P.2d 1352 (recognizing that it is "the high duty and responsibility of the judicial branch of government to facilitate and promote the [L]egislature's accomplishment of its purpose").

**{18}** We know the purpose of the key words in Section 56-8-4(D)—"[t]he state and its political subdivisions"—because they are the same words our Supreme Court has previously used to describe sovereign immunity. In *Hicks v. State*, our Supreme Court held that common law sovereign immunity could "no longer be interposed as a defense *by the [s]tate, or any of its political subdivisions*." 1975-NMSC-056, ¶ 9, 88 N.M. 588, 544 P.2d 1153 (emphasis added), *superseded by statute as recognized by Upton v. Clovis Mun. Sch. Dist.*, 2006-NMSC-040, ¶ 8, 140 N.M. 205, 141 P.3d 1259. Our Legislature later chose to use these words in Section 56-8-4(D) to describe who is exempt from the payment of interest. *See* 1983 N.M. Laws, ch. 254, § 2. This indicates that when the Legislature enacted Section 56-8-4(D), its purpose was to revive sovereign immunity with respect to the payment of pre- and post-judgment interest. *See Velasquez v. Regents of N. N.M. Coll.*, 2021-NMCA-007, ¶ 82, 484 P.3d 970 (observing that, under Section 56-8-4(D), "the state enjoys sovereign immunity from awards of interest on judgments").

**{19}** To determine whether this sovereign immunity statute applies to the PCF—i.e., whether the PCF is "the state"—we must understand the purpose served by the modern doctrine of sovereign immunity. As our Supreme Court recognized when it abolished common law sovereign immunity, "the archaic view that 'the sovereign can do no wrong'" is no longer a compelling rationale. *Hicks*, 1975-NMSC-056, ¶ 8. The modern doctrine of sovereign immunity is instead rooted in a desire by the Legislature to treat the government as a defendant differently because of the "broad scope of government duties." *Trujillo v. City of Albuquerque*, 1998-NMSC-031, ¶ 23, 125 N.M. 721, 965 P.2d 305. Due to the "unique nature of the duties adopted by the state," our Legislature has determined that there should be certain limits on the state's liability. *Id.*; *cf.* NMSA 1978, § 41-4-2(A) (1976) (defining the legislative intent of the New Mexico Tort Claims Act as limiting government liability because "the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done"). The purpose of these limits is to protect public funds. *See* Restatement (Second) of Torts § 45A spec. note (1979) ("If the [s]tate and its geographical subdivisions are subjected to tort liability, they may incur heavy financial drain. There has been fear the judgments will be large and the governments may be woefully short of funds."); Restatement (Second) of Torts § 895B cmt. a (1979) (noting that one argument advanced in favor of sovereign immunity is a "reluctance to divert public funds to compensate for private injuries").

**{20}** Mindful of the purpose of sovereign immunity and therefore of Section 56-8-4(D), the key question in determining whether Section 56-8-4(D) applies to the PCF is

whether holding the PCF liable for interest would deplete public funds. Answered simply, monies in the PCF are not public funds, and thus holding the PCF liable for interest would not deplete public funds. We know that it would not because of how the PCF is funded and how those funds may and may not be used. Unlike our state's general fund—which receives "all revenue[] not otherwise allocated by law," NMSA 1978, § 6-4-2 (1957)—the PCF receives only one specific type of revenue. *See* § 41-5-25(B). The PCF is not funded by taxes on the public, but instead by annual surcharges on individual health care providers who wish to be covered by the MMA. *See id.* ("To create the patient's compensation fund, an annual surcharge shall be levied on all health care providers qualifying under . . . Section 41-5-5."); § 41-5-5(A)(2) ("To be qualified under the provisions of the [MMA], a health care provider shall . . . pay the surcharge assessed on health care providers by the superintendent."); § 41-5-25(C) (providing the timing to pay the surcharge); § 41-5-25(D) (penalizing for the failure to pay within the statutory time limit). These significant differences in funding are mirrored by equally significant differences regarding expenditures. The Legislature has broad authority to determine how general funds are spent. *See* § 6-4-2 ("Expenditures from th[e general] fund shall be made only in accordance with appropriations authorized by the [L]egislature."). In stark contrast, funds in the PCF are to be "exclusive[ly] use[d] for the purposes stated in the [MMA]" and they "shall not become a part of or revert to the general fund." Section 41-5-25(A). The specific ways in which our Legislature has chosen to allow the PCF to receive and spend money, together with the clear and firm distinction our Legislature has drawn between the general fund and the PCF, indicate that monies held by the PCF, unlike monies in the general fund, are not public funds. And because using PCF funds to pay interest on medical malpractice judgments would not deplete public funds, we conclude the PCF does not enjoy sovereign immunity from the payment of interest under Section 56-8-4(D).

**{21}** The SOI argues that the monies in the PCF are public funds because they are "held in trust" in a segregated account in the state treasury. *See* § 41-5-25(A). We disagree.

**{22}** The PCF does not cite any New Mexico precedent that supports its theory, and the only pertinent New Mexico precedent we have found cuts against the PCF's theory. When a fund structured similarly to the PCF claimed immunity from interest under Section 56-8-4(D), this Court rejected its claim. In *Mares v. Valencia County Sherriff's Department*, 1988-NMCA-003, ¶ 35, 106 N.M. 744, 749 P.2d 1123, this Court held that interest was recoverable under Section 56-8-4(D) against the Subsequent Injury Fund in workers' compensation cases in New Mexico. The *Mares* Court was tasked with determining "whether the [Subsequent Injury] Fund [was] an entity of the state which [was] exempt from payment of post[-]judgment interest" under Section 56-8-4(D). *Mares*, 1988-NMCA-003, ¶¶ 2, 30. Like the PCF, the Subsequent Injury Fund was a "separate fund" held in the state treasury "for payments authorized under the provisions of the Subsequent Injury Act," paid into by those employers seeking coverage, and the superintendent of insurance was the custodian of the fund. *See* NMSA 1978, § 52-2-4(C) (1988) (repealed 1996). The *Mares* Court acknowledged that there was conflicting authority on "whether subsequent injury funds or special [workers'] compensation funds

[were] in fact instrumentalities of the state," but ultimately held that the trial court had "discretion to allow interest on compensation benefits payable by the [Subsequent Injury] Fund." 1988-NMCA-003, ¶¶ 32, 35. The SOI has not sought to distinguish *Mares*, and we are not aware of any distinction significant to the question presented in this case.

**{23}** We are not persuaded by the authority relied on by the SOI in support of its argument that the PCF is synonymous with the state because the PCF is a "segregated account in the state treasury" that contains "money acquired by the state" and is therefore "state money." Quoting American Jurisprudence, the SOI contends that "'[t]he fact that the government has taken possession of moneys pursuant to law is sufficient to constitute them government funds, even though they are held for a special purpose.'" (Quoting 63C Am. Jur. 2d *Public Funds* § 1 (2024).) We do not think that this gloss in a secondary authority supports the sweeping conclusion that possession by the government is always dispositive as to whether funds are public money. The gloss is based on just two cases that address narrow legal questions that are significantly different from the question we must answer, and interpreting those cases as broadly as the SOI suggests would create an internal contradiction within American Jurisprudence itself.

**{24}** The only case cited in support of the quotation from American Jurisprudence on which the SOI relies is *Money v. State ex rel. Fla. First Nat'l Bank at Port St. Joe*, 206 So.2d 436 (Fla. Dist. Ct. App. 1968), which involves a specific set of circumstances not present here. The funds at issue in *Money* were "borrowed from private sources by a body politic to be used for a public purpose and to be repaid by a pledge of funds to be extracted from citizens in the form of taxes." *Id.* at 438. Here, unlike in *Money*, the funds are not borrowed from private sources to be used for a public purpose, and, unlike in *Money*, funds obtained from citizens via taxation play no role in the PCF funds at issue here. Instead, the PCF is funded by surcharges paid by persons who choose to be protected by the MMA, *see* § 41-5-5(A)(2), and private individuals—those harmed by medical malpractice—receive payments from the PCF, *see* § 41-5-6.

**{25}** Also off target is the other precedent cited by American Jurisprudence as an illustrative example and relied on by the SOI here. In *Arizona v. Bowsher*, 935 F.2d 332, 334 (D.C. Cir. 1991), the court considered whether states could regulate certain federal funds held in a trust. The court noted that "[w]hen the United States sets aside money for the payment of specific debts, it does not thereby lose its property interest in that money," and ultimately held that "the states' plan would amount to direct regulation of federal property" and the Supremacy Clause disallowed that. *Id.* But we have not been asked whether a state may regulate federal funds or whether the Supremacy Clause is implicated. We do not read *Money* and *Bowsher* to support the conclusion that possession alone suffices to make funds public.

**{26}** And if we were to read the two precedents that broadly, we could not reconcile them with another entry in the same secondary source relied upon by the SOI. Section 23 of the same American Jurisprudence entry recognizes that possession by the state is

not the end of the inquiry: "[N]ot all moneys deposited into the state treasury represent public moneys subject to unfettered general appropriation by the legislature." *See* 63C Am. Jur. 2d *Public Funds* § 23 (2024). Instead, "[f]unds held in trust to be distributed according to legislatively prescribed conditions are not subject to appropriation, even though they are received on account of the state and the state treasurer is designated custodian." *Id.*; *accord Kansas Bldg. Indus. Workers Comp. Fund v. State*, 359 P.3d 33, 46 (Kan. 2015) (holding that funds "composed of payments for a particular and specific purpose" that "were to be kept as separate funds and not as part of the general fund" were not public money). Section 23 states that not all funds held by the state are public funds because "[t]he legislature cannot appropriate for general fund purposes funds that the state holds in trust or as a custodian, or for the benefit of a third party." 63C Am. Jur. 2d *Public Funds* § 23. Although the PCF is a fund held in the state treasury, it is segregated from the general fund, the funds are held for a specific purpose, and the use of the money for other purposes is prohibited by statute. *See* § 41-5-25. As we have explained, these qualities of the PCF support our holding that the funds that it holds are not public and that, accordingly, the sovereign immunity enjoyed by "the state" under Section 56-8-4(D) does not extend to the PCF.

## II.     Tender of Check and Accrual of Post-Judgment Interest

**{27}**     Defendants argue that the district court erred by failing to terminate the accrual of post-judgment interest when Defendants and the PCF tendered checks in July 2016. The checks were delivered with a letter stating that they were being "unconditionally tendered to satisfy the undisputed amount" owed to Plaintiff, which Defendants contend was sufficient to stop the accrual of interest. Because we are not persuaded by Defendants arguments and because Defendants have not presented us with an adequate record on which to review this issue, we affirm.

**{28}**     The relevant facts available in the record are as follows. On April 11, 2016, the district court entered its original order against Defendants for $2.6 million dollars. While the constitutional issue of the statutory cap was being litigated, on July 21, 2016, defense counsel hand-delivered two checks to Plaintiff's counsel: one for $200,000 issued by Defendants' insurer, The Doctors Company, and a second check for $1,335,916.15 issued by the PCF. In the letter, Defendants wrote that the "checks [were] being unconditionally tendered to satisfy the undisputed amount owed to" Plaintiff. The following day, Defendants delivered another letter entitled "Confidential Settlement Offer" to Plaintiff's counsel. In the letter, Defendants offered "$93,052.20 to resolve all outstanding issues." Because of this letter, Plaintiff contends that the tender made by Defendants and the PCF on July 21, 2016, was conditional and the payment was not the full, undisputed amount owed to Plaintiff. Plaintiff claims that because of this, she "brought the issue to the district court's attention during a December 20, 2016 hearing and requested defense counsel to state on the record that the tender was unconditional." After Defendants allegedly agreed at the hearing that the tender was unconditional, Plaintiffs cashed the checks.

**{29}** After remand from our Supreme Court on the constitutional issues, in July 2021, a presentment hearing was held on Plaintiff's proposed order, which calculated interest through December 2016. At the hearing, Defendants argued that the accrual of interest should have terminated in July 2016, while Plaintiffs argued that it should run through December 2016. The district court found that the amount offered in the July 22, 2016, letter, "$93,052.20, was intended to resolve all outstanding issues" and that "the letter [spoke] for itself." Without any additional factual findings, the district court calculated post-judgment interest through December 2016.

**{30}** By imposing interest through December 2016, the district court rejected Defendants' position and implicitly concluded that the July 2016 tender was conditional. We presume that the district court's conclusion is correct, and Defendants bear the burden of establishing that the district court erred, *see Corona v. Corona*, 2014-NMCA-071, ¶ 26, 329 P.3d 701, as well as the related burden of providing an adequate record for us to review the issue of whether the tender was unconditional, *see Sandoval*, 2009-NMCA-095, ¶ 65 ("It is the duty of the appellant to provide a record adequate to review the issues on appeal."). Based on Defendants' arguments and the incomplete record they have supplied on appeal, we are not persuaded that the district court erred.

**{31}** The gaps in the record make it impossible for us to conclude that the tender made in July 2016 was unconditional. The record includes no evidence about what happened between July 2016 and December 2016—the date when a hearing was apparently held during which Defendants *might* have stated on the record that the payments were unconditional. Unfortunately, we have no way of determining what occurred during that hearing because neither a transcript nor a recording of it is part of the record. To make matters worse, the record does not include any evidence about conversations between Plaintiff's counsel and defense counsel between the time when the checks were delivered and the December 2016 hearing.

**{32}** Because Defendants have not carried their burden on appeal to rebut the presumption of correctness of the district court's decision, *see id.*, we affirm the district court's ruling about when post-judgment interest stopped accruing.

**CONCLUSION**

**{33}** We affirm as to the amount of pre- and post-judgment interest, reverse as to the allocation of liability for the interest, and remand for amendment of the judgment consistent with this opinion.

**{34} IT IS SO ORDERED.**

**ZACHARY A. IVES, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**SHAMMARA H. HENDERSON, Judge**